**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **KATHRYN FLINT, on behalf of herself and all others similarly situated,** | Case No. 18- |
| **Plaintiff,** | |
| **v.** | **CLASS ACTION COMPLAINT** |
| **REVLON, INC., REVLON CONSUMER PRODUCTS CORP., and ALMAY, INC.,** | **DEMAND FOR JURY TRIAL** |
| **Defendants.** | |

Plaintiff Kathryn Flint, by her attorneys, brings this class action against Revlon, Inc., Revlon Consumer Products Corp., and Almay, Inc. (collectively, "Almay"), on her own behalf and on behalf of all others similarly situated, and alleges as follows:

## I.   INTRODUCTION

1.      Whether an annoying patch of dry skin or an oozing rash that affects one's social life, as much as 70% of the U.S. population is allergic to at least one personal care product ingredient. Most of these skin allergies are of unknown cause.

2.      It is extremely difficult for people to identify what ingredient they are allergic to. Allergic reactions are attenuated in both space and time. Some allergic reactions will not manifest until a week after exposure to the allergen.  Even worse – some allergic reactions will not manifest on the body part exposed to the allergen.  Instead, the immune system will sometimes "remember" the first exposure and the allergic reaction will develop on the body part that was *first* exposed to the allergen.

3.      Thus, consumers increasingly seek hypoallergenic products.  Those who do not suffer from skin allergies seek hypoallergenic products to avoid developing a skin allergy.  Those

who do suffer from a skin allergy seek hypoallergenic products to avoid the inflammatory cascade caused by an unidentified skin allergen.

4.     Seeking to capture the growing hypoallergenic market, Almay prominently labels many of its products as "hypoallergenic."  *See* Product Labels attached as Exhibit A.

5.     In an internal document, Almay defines what it means by the term "hypoallergenic:"

> In order for the word "hypo-allergenic" to be used in the labelling of a cosmetic product, said product shall have been formulated and manufactured in accordance with the following standards:
> 1.   Care shall have been exercised in the selection of the ingredients, and of the suppliers thereof, such that the product shall contain none of the following ingredients which are generally recognized and reported by competent authorities to be primary irritants or sensitizers …

Exhibit B (June 22, 1973 letter to FDA on behalf of Almay).

6.     However, despite its marketing scheme, Almay's products contain a shocking array and substantial amount of known skin sensitizers (allergens), agents that cause severe skin corrosion, serious eye damage, skin irritants, eye irritants, or are otherwise toxic or hazardous in the case of skin contact. *See* Exhibit A; ¶¶ 79-271, *infra*.

7.     In its internal document defining the term "hypoallergenic," Almay also lists dozens of ingredients it recognizes as "known allergens" that would be unacceptable in hypoallergenic products. Among others, Almay lists corn starch, salicylic acid, and zinc stearate as known allergens.  *See* Exhibit B.

8.     Yet Almay's products contain several of these known allergens, including corn starch, salicylic acid, and zinc stearate.  *See* Exhibit A.

9.     Many of the ingredients are permitted in cosmetics and body care products.   Yet Almay did not simply claim that its household products are "legal."  Almay falsely and

misleadingly claimed that the ingredients in its products are "hypoallergenic" when they are not.

10. By deceiving consumers about the nature, quality, and/or ingredients of its products, Almay is able to command a premium price, increasing consumers' willingness to pay and take away market share from competing products, thereby increasing its own sales and profits.

11. Consumers lack the ability to test or independently ascertain the toxicity of a chemical, especially at the point of sale. Reasonable consumers must and do rely on the chemicals company to honestly report the nature of the product's ingredients.

12. Almay further encouraged consumers to rely on its representations, marketing itself as an honest company that provides transparent and truthful information about its products' ingredients.

13. Almay intended for consumers to rely on its representations, and hundreds of thousands of reasonable consumers did in fact so rely.

14. As a result of its false and misleading labeling, Almay was able to sell these products to hundreds of thousands of consumers throughout the United States and to profit handsomely from these transactions.

15. Almay's false and misleading representations and omissions violate state and federal law, both civil and criminal, detailed more fully below, including New York statutes, and common law.

16. Plaintiff brings this action to stop Almay's deceptive and misleading practices.

## II.    <u>JURISDICTION AND VENUE</u>

17. This Court has personal jurisdiction over the parties in this case.

18. Plaintiff is a citizen of California.

19. This Court has personal jurisdiction over each Defendant because they are all

corporations with their principal place of business within the state of New York, at One New York Plaza, New York, NY 10004.

20. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). Jurisdiction under CAFA is met because the proposed number of putative class members exceeds 100, at least one plaintiff and one defendant are citizens of different states, and the amount in controversy, including, but not limited to the aggregate amount of relief sought by absent class members, exclusive of interest and costs, exceeds $5 million.

21. Venue is proper in this District under 28 U.S.C. § 1391(b) because all Defendants reside in this District.

22. No other forum would be more convenient for the parties and witnesses to litigate this action.

### III. PARTIES

23. Plaintiff Kathryn Flint is an individual consumer who, at all times material hereto, was a citizen of the State of California. During the class period, Plaintiff Flint occasionally purchased several of the Falsely Labeled Products at retail prices. For example, Ms. Flint occasionally purchased Almay's Truly Lasting Color Liquid Makeup, Almay's Clear Complexion Concealer, and Almay's Color + Care Liquid Lip Balm at the Walgreens located at 1189 Potrero Avenue, San Francisco, CA 94110.

24. In deciding to make these purchases, Plaintiff Flint saw, relied upon, and reasonably believed the label representation that the products were "hypoallergenic." These representations were a significant reason for her purchases.

25. Plaintiff Flint and her family members have all suffered skin irritation, eye irritation, dermatitis, and/or an allergic skin reaction in the past.

26.     Like similarly situated consumers, Plaintiff Flint does not know the identity of every ingredient she and her family are allergic to.  Moreover, like similarly situated consumers, Plaintiff Flint does not know which ingredients she or her family may develop an allergy to.

27.     Had Plaintiff Flint known at the time that these products were not hypoallergenic as promised, she would not have purchased these products.

28.     Had Plaintiff Flint known at the time that these products contained irritating, toxic, hazardous, or otherwise harmful chemicals, she would not have purchased these products.

29.     Plaintiff Flint purchased, purchased more of, or paid more for, these products than she would have had she known that the products contained skin sensitizers, irritants, toxins, carcinogens, or otherwise harmful chemicals.

30.     If Almay's products were reformulated such that its representations were truthful, Plaintiff Flint would purchase Almay's products in the future.  Plaintiff Flint regularly visits stores where Almay's products are sold, and continually sees Almay's packaging but has no way of determining the truth of the representation that the products are hypoallergenic.

31.     The products that Plaintiff Flint purchased are substantially similar to Almay's other products alleged to be falsely labeled.

32.     Defendant Revlon, Inc. is a corporation with its principal place of business located at One New York Plaza, New York, New York.  Doing business under its brand "Almay," Revlon, Inc. manufactures and/or causes the manufacture of cosmetics and personal care products.  Revlon, Inc. labels these products under its "Almay" brand name and markets and distributes the products in retail and online stores located throughout the United States.

33.     Defendant Revlon Consumer Products Corp. is a corporation with its principal place of business located at One New York Plaza, New York, New York.  Doing business under

its brand "Almay," Revlon Consumer Products Corp. manufactures and/or causes the manufacture of cosmetics and personal care products. Revlon Consumer Products Corp. labels these products under its "Almay" brand name and markets and distributes the products in retail and online stores located throughout the United States.

34.     Defendant Almay, Inc. is a corporation with its principal place of business located at One New York Plaza, New York, New York. Almay, Inc. manufactures and/or causes the manufacture of cosmetics and personal care products. Almay, Inc. labels these products under its "Almay" brand name and markets and distributes the products in retail and online stores located throughout the United States.

## IV.     FACTUAL ALLEGATIONS

### A.     Consumers Actively Seek Hypoallergenic Cosmetics And Body Care Products

35.     According to the Centers for Disease Control and Prevention ("CDC"), 8.8 million children (12% of U.S. children) reported skin allergies in 2012. Skin allergies are even more prevalent among young children; CDC reports that 14.2% of children between the ages of 0 and 4 suffered a skin allergy in 2012.

36.     These numbers are likely to underreport the prevalence of allergic contact dermatitis; recent studies show that somewhere between 14-70% of children suffer from skin allergies, based on positive patch skin tests.

37.     Skin allergies are similarly prevalent among adults.

38.     When skin is exposed to a sufficient amount of a chemical allergen, the skin is "sensitized." Upon re-exposure to the allergen, the skin initiates an inflammatory cascade, causing skin changes associated with allergic contact dermatitis. These include redness, oedema (fluid retention), scaling, fissures (cracking), vesicles (fluid-filled sacs), bullae (bubble-like cavity), and

eventually oozing.

39.     Contact sensitization and related skin allergies can severely affect a person's quality of life, depending on the severity and the site of skin sensitization.  People suffering from noticeable skin allergies will try to hide the symptoms under clothing if possible, and if not, will avoid public spaces entirely.  In either case, skin allergies can dramatically affect a person's confidence and engagement in life.

40.     It is difficult to identify the substance causing an allergic response.  Allergic contact dermatitis develops several days after exposure to a skin allergen.  Some substances do not cause symptoms until a week after exposure.

41.     Even more, once an individual is sensitized to an allergen, future contact with the allergen can trigger a response in the *original* site of sensitization. For example, if someone had an allergic response to a product used on the face, and later used a different product containing the same allergen on the legs, the allergic response will occur again on the *face* – even if the face was never exposed to the second product.

42.     When a consumer cannot identify the material to which they are allergic, allergic contact dermatitis will persist, and, it is believed, will take longer to resolve even after the cause is identified.

43.      Thus, consumers will actively seek out hypoallergenic products – to avoid a skin allergy from occurring at all and/or to prevent a known skin allergy from repeating the inflammatory cascade.

**B.     Almay Bases Its Brand On Its Hypoallergenic Representations**

44.     Almay bases its brand on its promise of providing hypoallergenic products.

45.     In fact, Almay claims that it was formed for the purpose of providing

hypoallergenic products:

> How we made history
>
> Almay has been changing the name of the game since 1931. In a world of heavy, high fragranced, irritating products, Almay chemist and founder Alfred Woititz embarked on a beauty line that defied the times.
>
> His inspiration? His wife. Fanny May had sensitive skin, a delicate complexion and lots of opinions. Together, they worked to create products that would help all women look and feel their best. With the help of Dermatologist Dr. Marion Sulzberger, the duo created the first hypoallergenic, fragrance-free cosmetic line. They coined it Almay, a perfect combination of Al+May.
>
> Part science. Part self-expression. Almay has always led the way.

Exhibit C (Almay – How We Feel About Makeup.pdf). *See also* Exhibit D (Almay History.pdf).

46.     Almay repeats its "hypoallergenic" representation like a mantra, emblazoning the term on its advertisements, product displays, and product labels. *See* Exhibit A; Exhibit E (Magazine advertisements).

**C.     Definition of Hypoallergenic**

47.     ***Reasonable consumer definition:*** A reasonable consumer believes that a product labeled as "hypoallergenic" does not contain skin allergens in an amount that can reasonably be expected to induce an allergic response in a significant number of people.

48.     ***Dictionary definition:*** The dictionary definition of "hypoallergenic" comports with the reasonable consumer's definition.  For example, according to the Merriam-Webster Dictionary, "hypoallergenic" means "having little likelihood of causing an allergic response." *See* https://www.merriam-webster.com/dictionary/hypoallergenic, last viewed March 27, 2018.

49.     ***Scientific/regulatory definition:*** The scientific and regulatory definition of "hypoallergenic" also comports with the reasonable consumer's definition.  Under federal regulations and the universally recognized system adopted by scientists around the world, a

8

chemical is classified as a "skin sensitizer" if it is known to cause an allergic response to enough people or test animals even at very low concentrations. If it causes an allergic response to a sufficiently large percentage of the population at extremely low concentrations, *e.g.,* $\leq 500$ μg/cm$^2$ causes a positive response upon skin contact in a substantial number of persons in a human repeat insult past test, or $\leq 0.1\%$ intradermal induction dose causes a positive response in more than 30% of guinea pigs in a guinea pig maximization test, etc., it is classified as a Category 1 skin sensitizer. *See* 29 C.F.R. § 1910.1200 Appendix A.4.2.2.

50. That is, a chemical that is classified as a Category 1 skin sensitizer is a chemical that, at concentrations of 0.1% (or similar), has been shown in laboratories to cause an allergic response in a significant number of people:



51. If a product contains 0.1% or more Category 1 skin sensitizers, testing has already confirmed that the product causes an allergic response to a sufficiently large percentage of the

population. Whether the skin sensitizer is diluted with Almay's product or a laboratory's aqueous solution, the product (or solution) has been shown to cause an allergic response to a sufficiently large percentage of the population because it contains Category 1 skin sensitizers by 0.1% or more.

52. Thus, a product containing concentrations of 0.1% of Category 1 skin sensitizers are products that cause an allergic response in a significant number of people:



Product containing **0.1% concentration of Category 1 skin sensitizers** causes an allergic response to a substantial number of people

53. The reasonable consumer's definition, the dictionary definition, and the scientific and regulatory definition all essentially define hypoallergenic in the same way: a hypoallergenic product is a product that does not contain skin sensitizers (a.k.a. skin allergens) in an amount that can be reasonably be expected to induce an allergic response in a significant number of people, *i.e.,* it is a product that does ***not*** "hav[e] little likelihood of causing an allergic response."

54. ***Almay's definition:*** Almay's own definition of "hypoallergenic" goes a step

10

further. Almay defines what it means by "hypoallergenic" in an internal document, explaining that a hypoallergenic product contains no ingredients reported by competent authorities as a primary irritant or sensitizer:

> In order for the word "hypo-allergenic" to be used in the labelling of a cosmetic product, said product shall have been formulated and manufactured in accordance with the following standards:
> 1. Care shall have been exercised in the selection of the ingredients, and of the suppliers thereof, such that the product shall contain none of the following ingredients which are generally recognized and reported by competent authorities to be primary irritants or sensitizers …

Exhibit B.

55. Almay's definition also comports with reasonable consumers' expectations.

56. Under all definitions of "hypoallergenic" (the reasonable consumer definition, the dictionary definition, the scientific/regulatory definition, and Almay's definition), none of Almay's Falsely Labeled Products are "hypoallergenic."

57. All Almay's Falsely Labeled Products contain known skin sensitizers and irritants. Thus, Almay's "hypoallergenic" definition is false under Almay's own definition of the term.

58. All Almay's Falsely Labeled Products contain at least 0.1% Category 1 skin sensitizers, by volume. Because a product containing a 0.1% concentration of Category 1 skin sensitizers has been demonstrated by reputable scientific authorities as being reasonably expected to induce an allergic response in a significant number of people, the "hypoallergenic" representation on Almay's Falsely Labeled Products is false under the reasonable consumer's definition, the dictionary definition, and the scientific/regulatory definition, as well as Almay's own definition.



Almay's product (which contains at least **0.1% concentration of Category 1 skin sensitizers**) causes an allergic response to a substantial number of people

59. All Almay's Falsely Labeled Products additionally contain skin sensitizers that, while not classified as Category 1 skin sensitizers, have been demonstrated by reputable scientific authorities as being reasonably expected to induce an allergic response in a significant number of people at very low concentrations. These additional skin sensitizers, in combination with the concentration of skin sensitizers classified as Category 1 skin sensitizers, further demonstrates that the "hypoallergenic" representation on Almay's Falsely Labeled Products is false under the reasonable consumer's definition, the dictionary definition, the scientific/regulatory definition, as well as Almay's own definition.

60. In fact, given the quantity of skin sensitizers in Almay's products, under federal regulations, all Almay's Falsely Labeled Products must contain a ***warning*** that the product itself is a skin sensitizer. If a skin sensitizer makes up 0.1% or more of a product, federal regulations classify the ***entire product*** as a Category 1 (most serious) skin sensitizer, and even ***requires a product warning***. 29 C.F.R. § 1910.1200 Appendix A.4.3.3 ("The mixture shall be classified as a respiratory or skin sensitizer when at least one ingredient has been classified as a respiratory or skin sensitizer and is present at or above the appropriate cut-off value/concentration limit for the specific endpoint as shown in Table A 4.5 [≥ 0.1%].")

61. Similarly, under federal regulations, if the product contains a sensitizer that may

elicit a response at concentrations less than 0.1% in individuals who are already sensitized to the chemical, federal regulations classify the ***entire product*** as a Category 1 skin sensitizer. 29 C.F.R. § 1910.1200 Appendix A.0.4.3.2 ("If the classifier has information that the hazard of an ingredient will be evident (*i.e.,* it presents a health risk) below the specified cut-off value/concentration limit, the mixture containing that ingredient shall be classified accordingly.").

62.     A product that is itself a skin sensitizer (a.k.a., a skin allergen) cannot – under any definition – be truthfully claimed to be "hypoallergenic."

63.     Once skin is sensitized, even a ***minute*** amount of the chemical allergen is enough to cause a full-blown allergic response. Thus, consumers seeking hypoallergenic products commonly ***also*** expect that the product does not contain ***any*** skin sensitizers.

64.     All Almay's Falsely Labeled Products contain substances classified as Category 1 skin sensitizers. *See infra* at ¶¶ 79-101 (identifying chemicals classified as Category 1 skin sensitizers) and Exhibit A (showing which products contain these skin sensitizers). All Almay's Falsely Labeled Products also contain other skin sensitizers, *see infra* at ¶¶ 102-144 and Exhibit A (showing which products contain these skin sensitizers), as well as ingredients classified by reputable authorities as causing skin irritation, skin corrosion, and/or eye damage. *See infra* at ¶¶ 145-271 and Exhibit A (showing which products contain these skin/eye irritants).

65.     ***All*** Almay's Falsely Labeled Products substances classified as Category 1 skin sensitizers at concentrations larger than 0.1%, or at concentrations that may elicit an allergic response at concentrations smaller than 0.1% in sensitized individuals.

66.     Thus, Almay's products are not hypoallergenic.

67.     Thus, Almay's on-the-label promise that its products are "hypoallergenic" is false. Almay's on-the-label promise that its products are "hypoallergenic" is ***also*** misleading.

13

68.     Almay knows how consumers understand "hypoallergenic," and encourages this understanding.

69.     Because even a ***minute*** amount of a chemical allergen is enough to cause a full-blown allergic response, consumers *also* reasonably expect and believe that when a product is labeled as "hypoallergenic," this representation is true not just for the final formulation, but to every ingredient in the product.

70.     Almay knows and encourages this understanding.

71.     Almay knows that consumers rely upon it to not only test the final product formulation for basic safety, but to select only those ingredients that it considers to be safe.

72.     Almay's standard of looking at each individual ingredient traces back to the origin of the brand.  As Almay explains:

> The origin of the line was based on identifying all known allergens and then formulating products eliminating these ingredients . . . . and this diligence has been perpetuated to the current time. . . .

Exhibit B, at 5. *See also* Exhibits C, D.

73.     Almay continues to represent to consumers that it examines each individual ingredient. As Almay explains to consumers today:

> Stringent Standards of Quality Control
>
> Almay is so stringent that fewer than 500 of the over 10,000 ingredients available for use in cosmetics meet almay's superior standards. Raw materials and finished products are closely monitored for quality and purity. All new ingredients are carefully screened for their potential for sensitization and toxicity.

Exhibit D; *see also* Exhibits B, C. However, many ingredients in Almay's products have not been adequately studied for sensitization and toxicity. *See* ¶¶ 79-271, *infra*.

**D.     Almay's False Representations**

74.     On the products' labels, and again on its retail website, Almay represents that

certain of its products are "hypoallergenic." These products, (collectively, the "Falsely Labeled Products") are all falsely labeled, as all of these products contain skin sensitizers, skin irritants, eye irritants, and other deleterious compounds.

75. These products are:

intense i-color eyeliner
intense i-color liquid eyeliner
intense i-color liquid shadow + color primer
one coat thickening waterproof mascara
intense i-color volumizing mascara
one coat lengthening mascara
one coat thickening mascara
one coat get up & grow mascara
wake-up undereye concealer
smart shade concealer
smart shade smart balancing pressed powder
oil free makeup eraser sticks
truly lasting color liquid makeup
smart shade perfect & correct primer
longwear & waterproof eye makeup remover pads
oil free gentle eye makeup remover pads
Sensitive Skin Anti-Perspirant & Deodorant - Roll-On
liquid eyeliner
eyeliner [aka "eyeliner pencil"]
intense i-color gel smooth liner
intense i-color evening smoky
intense i-color everyday neutrals
intense i-color party brights
one coat multi-benefit mascara
one coat get up & grow waterproof mascara
smart shade cc cream complexion corrector
clear complexion concealer
clear complexion pressed powder
smart shade anti-aging skin tone matching makeup
smart shade skintone matching makeup
oil free gentle eye makeup remover
oil free makeup remover towelettes
clear complexion makeup remover
brow defining pencil
smart shade butter kiss lipstick
age essentials lip treatment
the complete look makeup palette
pen eyeliner

intense i-color defining liner
age essentials concealer
age essentials makeup
healthy glow makeup + gradual self tan

76.     The labels of these products are attached as Exhibit A.

77.     Further encouraging consumers' reliance on Almay's "hypoallergenic" promise, Almay labels only ***some*** products as hypoallergenic, giving consumers the (false) impression that Almay carefully reviewed each ingredient in its products to ensure that the "hypoallergenic" promise was made for only those products that truly are hypoallergenic. *See, e.g.,* Exhibit F.

78.     Yet, contrary to Almay's promise, ***all*** these products in fact contain ***known*** skin sensitizers, all of which are classified as Category 1 skin sensitizers. *See ¶¶ 79-101, infra.* Many also contain other known skin sensitizers. *See ¶¶ 102-144, infra.* They ***also all*** contain known skin or eye irritants. *See ¶¶ 79-271, infra.*

### 1.     <u>Category 1 Skin Sensitizers</u>

79.     ***All*** Almay's Falsely Labeled Products contain one or more of the following chemicals, which are classified as Category 1 skin sensitizers: acacia senegal gum, acrylonitrile/methacrylonitrile/methyl methacrylate copolymer, benzoic acid, benzyl alcohol, BHT, triethanolamine, tetrasodium EDTA, sorbic acid, salicylic acid, cellulose gum, chamomilla recutita (matricaria) flower extract, chromium hydroxide green (CI 77289), chromium oxide greens (CI 77288), ethylparaben, HDI/trimethylol hexyllactone crosspolymer, quaternium-15, propylene glycol, polysorbate 20, phytantriol, niacinamide, methylparaben, imidazolidinyl urea, sodium chondroitin sulfate, trioctyldodecyl citrate, oxybenzone, and sodium laureth-12 sulfate. Many of these ingredients are also skin/eye irritants as well, as noted below:

80.     ***Acacia senegal gum*** is classified as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an

allergic response in a substantial number of persons. It is known to cause local contact dermatitis. It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days. It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

81.    ***Acrylonitrile/methacrylonitrile/methyl methacrylate copolymer*** is classified as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons. Acrylonitrile/methacrylonitrile/methyl methacrylate copolymer is known to cause occupational allergic contact dermatitis. The European Union also classifies it as a skin sentisizer. It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days. It is also a suspected skin or sense organ toxicant. It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application. It is a Category 1B Carcinogen, meaning that it is presumed to induce cancer or increase its incidence in humans, based on animal data. It is a Category 2 germ cell mutagen, meaning that it is suspected of mutating human cells in a way that can be transmitted to children conceived after exposure. It is a Category 1B reproductive toxin, meaning that, based on animal testing, it is presumed to cause effects on human reproduction or development and may damage fertility or the unborn child. It is a teratogen, meaning that it causes birth defects. It is regulated under federal law as an extremely hazardous substance.

82.    ***Benzoic acid*** is classified as a Category 1 skin sensitizer, meaning that repeated

skin contact causes a skin allergy (including contact urticaria) in a substantial number of persons. In these sensitized individuals, very low future exposure can cause itching and a skin rash. It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days. It is also a suspected skin or sense organ toxicant. It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application. It is a mutagen, meaning that it is suspected of mutating human cells in a way that can be transmitted to children conceived after exposure. It is a Category 2 reproductive toxin, meaning that it is suspected of damaging fertility or the unborn child based on human or animal evidence. Benzoic acid is classified by federal law as a hazardous substance that presents an imminent and substantial danger to the public health or welfare. It is toxic by definition under federal law, based on animal testing demonstrating that the substance is lethal even in very small doses.

83. ***Benzyl alcohol*** is classified as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons. It is known to cause allergic reactions in 1.2 to 15% of patients with eczema from cosmetic products. It is also known to induce nonimmunologic contact reactions without any previous sensitization. It is classified as a skin irritant. It is also a suspected skin or sense organ toxicant. It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva. Some animal tests indicate that it causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application. It may also be a teratogen, causing birth defects. Animal studies have shown it causes lung, liver, kidney, and central nervous

system disorders. It is a suspected immunotoxicant, suspected neurotoxicant, and suspected skin or sense organ toxicant. It is toxic to aquatic organisms, toxic by definition under federal law, and its use is restricted in Europe.

84. ***BHT*** is classified as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons. BHT is recognized as an allergen by the American Contact Dermatitis Society.  It is classified as a skin irritant. It is also a suspected skin or sense organ toxicant.  It is a Category 2B eye irritant, causing corneal opacity, iritis, conjunctival redness, or conjunctival edema, reversible in 7 days.  It is a mutagen, meaning that it is suspected of mutating human cells in a way that can be transmitted to children conceived after exposure. It is a Category 2 reproductive toxin, meaning that it is suspected of damaging fertility or the unborn child based on human or animal evidence. It is a teratogen, meaning that it causes birth defects.

85. ***Triethanolamine*** is classified as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons. Triethanolamine is known to cause occupational allergic contact dermatitis. The European Union also classifies it as a skin sensitizer.  It causes Category 1B skin corrosion, meaning that it irreversibly damages the skin after short exposure; in animal tests, the substance caused visible necrosis after less than 1 hour of exposure. Corrosive reactions are typified by ulcers, bleeding, bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars. It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.

86. ***Sorbic acid*** is classified as a Category 1 skin sensitizer, based on positive animal

and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons. It is recognized as an allergen by the American Contact Dermatitis Society. It causes Category 1B skin corrosion, meaning that it irreversibly damages the skin after short exposure; in animal tests, the substance caused visible necrosis after less than 1 hour of exposure. Corrosive reactions are typified by ulcers, bleeding, bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars. It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

87. ***Salicylic acid*** is classified as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons. It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days. It is also a suspected skin or sense organ toxicant. It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application. It is a mutagen, meaning that it is suspected of mutating human cells in a way that can be transmitted to children conceived after exposure. It is a Category 2 reproductive toxin, meaning that it is suspected of damaging fertility or the unborn child based on human or animal evidence. It is a teratogen, meaning that it causes birth defects. Epidemiological studies demonstrate a relationship between the use of salicylate and Reye's syndrome in children and adolescents (mostly 5 to 15 years). Salicylic acid intoxication may occur through placental transfer and breast milk. In fact, in an internal document defining the term "hypoallergenic," Almay lists salicylic acid as a "known" allergen" that it deems unacceptable in hypoallergenic

products.  Exhibit B.   Nonetheless, salicylic acid makes up as much as 1.08% of Almay products.  **Cellulose gum** is classified as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons.

88.	**Chamomilla recutita (matricaria) flower extract** is classified as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons.  It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days.

89.	**Chromium hydroxide green (CI 77289)** is classified as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons.  It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days.  It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

90.	**Chromium oxide greens (CI 77288)** is classified as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons.  It causes Category 1A skin corrosion, meaning that it irreversibly damages the skin after short exposure; in animal tests, the substance caused visible necrosis after less than 3 minutes of exposure. Corrosive reactions are typified by ulcers, bleeding, bloody scabs, and, by the end of observation at 14 days, by

discoloration due to blanching of the skin, complete areas of alopecia, and scars. It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.

91.    ***Ethylparaben*** is classified as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons. It is also a Category 2 eye irritant, causing adverse effects on the cornea, iris, conjunctiva, and a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days. It is a teratogen, meaning that it causes birth defects, and is linked to reproductive-specific developmental abnormalities.

92.    ***HDI/trimethylol hexyllactone crosspolymer*** is classified as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons.

93.    ***Quaternium-15*** is a skin and eye irritant, a relatively common cause of allergic contact dermatitis in consumers, and is classified as a Category 1 skin sensitizer, as animal and/or human studies demonstrate that repeated skin contact causes allergic contact dermatitis in a substantial number of persons. In these sensitized individuals, very low future exposure can cause itching and a skin rash. It is recognized as an allergen by the American Contact Dermatitis Society. The European Union also classifies it as a skin sensitizer. It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days. It is also a suspected skin or sense organ toxicant. It is a Category 2 eye

irritant, causing adverse effects on the cornea, iris, and conjunctiva. It contains methylene chloride (which is known to cause cancer in animal studies) and releases formaldehyde (a suspected carcinogen). It is a teratogen, meaning that it causes birth defects. It is very toxic to aquatic life and environmentally persistent (*i.e.*, not biodegradable). It is toxic by definition under federal law, based on animal testing demonstrating that the substance is lethal even in very small doses.

94. ***Propylene glycol*** is a Category 1 skin sensitizer, meaning that repeated skin contact causes a skin allergy in a substantial number of persons. In these sensitized individuals, very low future exposure can cause itching and a skin rash. It is recognized as an allergen by the American Contact Dermatitis Society and is known to cause occupational allergic contact dermatitis. It is classified as a skin irritant. It is also a suspected skin or sense organ toxicant. It is also classified as an eye irritant. It is a mutagen, meaning that it is suspected of mutating human cells in a way that can be transmitted to children conceived after exposure. It is a teratogen, meaning that it causes birth defects. Moreover, animal testing indicates that propylene glycol may cause adverse reproductive effects. It is also very toxic to aquatic life.

95. ***Polysorbate 20*** is classified as a Category 1 skin sensitizer, based on multiple positive tests demonstrating that repeated skin contact can be expected to cause allergic response in a substantial number of persons. It is also a Category 2 skin and eye irritant, causing skin damage in less than four hours and adverse effects on the cornea, iris, and conjunctiva. It is made in part with ethylene oxide, resulting in 1,4 dioxane as a trace contaminant, which is classified as a possible carcinogen. It is a teratogen, meaning that it causes birth defects.

96. ***Phytantriol*** is classified as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons. It is a Category 2 skin irritant, meaning that it causes

significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days.

97.     **Niacinamide** is a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons.   It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.  It is a mutagen, meaning that it is suspected of mutating human cells in a way that can be transmitted to children conceived after exposure.

98.     The use of **methylparaben** in cosmetics and topical products has caused allergic contact dermatitis. It is classified as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons. It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days.  It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

99.     **Imidazolidinyl urea** is a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons. Imidazolidinyl urea is recognized as an allergen by the American Contact Dermatitis Society and is known to cause occupational allergic contact dermatitis.  **Sodium chondroitin sulfate** is classified as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons.   It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.   It is a teratogen, meaning that it causes birth

defects.  **_Trioctyldodecyl citrate_** is classified as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons.

100.  **_Oxybenzone_** is classified as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons. Oxybenzone is recognized as an allergen by the American Contact Dermatitis Society.  Nonetheless, it makes up to 5% of Almay products labeled as "hypoallergenic."

101.  **_Sodium laureth-12 sulfate_** is classified as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons.  It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days.  It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.  It is also harmful to aquatic life and toxic by definition under federal law, based on animal testing demonstrating that the substance is lethal even in very small doses.

**2.**  <u>**Additional Chemicals Found To Be Skin Sensitizers**</u>

102.  Almost[1] all of Almay's Falsely Labeled Products **_also_** contain **_additional_** chemicals which have been found to be skin sensitizers by reputable sources (many of which are also skin/eye

---

[1]  All Almay's Falsely Labeled Products also contain one or more of these additional skin sensitizers except for Almay's intense i-color gel smooth liner in navy, black, charcoal, and espresso.  As alleged *supra*, however, Almay's intense i-color gel smooth liners all contain a Category 1 skin sensitizer.  They also contain synthetic wax, which has produced sensitization reactions in humans.

irritants, as well, as noted):

103. ***Menthol*** is classified as a fragrance allergen in the European Union. This finding is confirmed by animal testing demonstrating that menthol is a skin sensitizer. It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days. It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.

104. ***Phenoxyethanol*** is recognized as an allergen by the American Contact Dermatitis Society, and has induced an allergic response in both human and animal testing. It is also a skin and severe eye irritant. It is toxic by all routes (inhalation, ingestion, and dermal contact). It is extremely hazardous in case of eye contact and very hazardous in case of skin contact (defatting the skin and causing skin inflammation characterized by itching, scaling, reddening, or, occasionally, blistering). Even short exposure can cause serious temporary or residual injury. It is toxic to the kidneys, the nervous system, and the liver, adversely affecting the central nervous system and peripheral nervous system, causing headaches, tremors, and central nervous system depression. It degrades into substances that are even more toxic. It is a germ cell mutagen, suspected of mutating human cells in a way that can be transmitted to children conceived after exposure. It is also a reproductive toxin, suspected of damaging fertility or the unborn child based on human or animal evidence. Phenoxyethanol is an ethylene glycol ether, which is known to cause wasting of the testicles, reproductive changes, infertility, and changes to kidney function. Phenoxyethanol is also a carcinogen, meaning that it is suspected to induce cancer or increase its incidence. Case studies indicate that repeated exposure to phenoxyethanol results in acute

neurotoxic effects, as well as chronic solvent- induced brain syndrome, constant irritability, impaired memory, depression, alcohol intolerance, episodes of tachycardia and dyspnea, and problems with balance and rash. Phenoxyethanol is also toxic by definition under federal law, and is regulated as a toxic compound. Its use is restricted in Europe. Nonetheless, Almay uses phenoxyethanol in no less than 99 products labeled as "hypoallergenic."

105. ***Octinoxate*** is known to cause photoallergic contact dermatitis in certain individuals. It is recognized as an allergen by the American Contact Dermatitis Society. At concentrations of 7.5%, it causes photo-sensitization in one out of 108 patients. Nonetheless, it makes up to 7.5% of Almay products labeled as "hypoallergenic."

106. ***Cetearyl alcohol*** is recognized as an allergen by the American Contact Dermatitis Society. Its safety for use in cosmetics and bodycare products has not been adequately assessed. The limited testing done, however, shows it to be a skin irritant and eye irritant, causing skin damage in less than four hours and adverse effects on the cornea, iris, conjunctiva. It is inherently toxic to aquatic life. It is also toxic to the mucous membranes, and is hazardous by definition under federal law.

107. ***Sorbitan sesquioleate*** is an increasingly common skin sensitizer. It is recognized as an allergen by the American Contact Dermatitis Society. It is also classified as a skin and eye irritant.

108. Some testing classifies ***benzophenone 4*** as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons. Benzophenone 4 is recognized as an allergen by the American Contact Dermatitis Society. It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation

of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days. It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

109. Some testing classifies ***diazolidinyl urea*** as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons. Diazolidinyl urea is recognized as an allergen by the American Contact Dermatitis Society and is known to cause occupational allergic contact dermatitis. It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva. Some tests indicate that it causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application. It is also a formaldehyde releaser.

110. ***Stearyl alcohol*** is a skin sensitizer, based on human evidence, and a known skin and eye irritant.

111. ***Sodium hyaluronate*** has caused allergic responses in animal testing. Some tests classify it as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons.

112. ***TEA-stearate*** is a skin sensitizer. In fact, it is a common cause of contact allergy to commercial sunscreens. It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days. It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

113. Some testing classifies ***tetrasodium EDTA*** as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected

to cause an allergic response in a substantial number of persons.  It is classified as a skin irritant.  It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.  It is an aliphatic amine, which is known to be environmentally toxic.

114.    Some testing classifies ***yellow 5 lake (CI 19140), also listed as yellow 5 (CI 19140),*** as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons.    It is a teratogen, meaning that it causes birth defects.

115.    Though ***xanthan gum*** is safe as a food ingredient, it is not so safe for the skin.  Some testing indicates that it is a skin sensitizer.  It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days.  It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

116.    Animal testing demonstrates that ***trimethylsiloxysilicate*** is a sensitizer.

117.    ***Stearic acid*** is a skin sensitizer, based on positive human testing, demonstrating that repeated skin contact can be expected to cause erythema in a substantial number of persons.  It causes Category 1B skin corrosion, meaning that it irreversibly damages the skin after short exposure; in animal tests, the substance caused visible necrosis after less than 1 hour of exposure.  Corrosive reactions are typified by ulcers, bleeding, bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars.  It is also classified as an eye irritant. It is also inherently toxic to aquatic animals.

118.    Some testing classifies ***sodium benzoate*** as a Category 1 skin sensitizer, based on

positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons.  It is also a skin irritant and causes serious eye damage.   It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva. Some testing finds that it causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.  It is a teratogen, meaning that it causes birth defects. Its use in personal care products is limited in Europe.

119.    Human testing demonstrates that ***cetyl palmitate*** is a skin sensitizer in humans.  It is also classified as a skin and eye irritant.

120.    Some tests classify ***red 6 lake (CI 15850), also listed as red 7 lake (CI 15850),*** as a Category 1 skin sensitizer. It is also classified as a skin and eye irritant.

121.    ***Cera alba ((beeswax) cire d'abeille)*** is classified as a skin/eye irritant. Some studies classify it as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons.

122.    Several tests classify ***camellia sinensis leaf extract,*** also listed as camellia sinensis leaf (green tea) extract, as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons.

123.    Some testing classifies ***ethylene/VA copolymer*** as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons.

124.    Some tests have classified ***red 30 lake (CI 73360)*** as a Category 1 skin sensitizer,

based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons.   In Europe, it is prohibited from being added to cosmetic or bodycare products.

125.    Some testing classifies *ginkgo biloba leaf extract* as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons.    It is a Category 2 Carcinogen, meaning that it is suspected of inducing cancer or increasing its incidence.

126.    *Hexylene glycol* is a recognized skin sensitizer, causing occupational allergic contact dermatitis. It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days. It is also a suspected skin or sense organ toxicant.  It is a Category 2A eye irritant, causing corneal opacity, iritis, conjunctival redness, or conjunctival edema, lasting 7-21 days.

127.    Some studies classify *propylparaben* as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons. It is also a suspected skin or sense organ toxicant.  Additional testing demonstrates that it causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.

128.    *Polybutene* was found to be sensitizing in animal testing, including in vivo mouse local lymph node assays. It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days.

129.    According to some tests, ***panax ginseng root extract*** is a Category 1 skin sensitizer. It is also classified as a skin and eye irritant.

130.    ***PVP*** is a skin sensitizer, based on positive human testing.  In fact, it is a relatively common occupational allergy; 5% of Japanese physicians report having a contact allergy to PVP.

131.    Animal testing confirms that ***oleic acid*** is a skin sensitizer.  It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days.  It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.  It is also inherently toxic to aquatic life. Additionally, according to a supplier, in humans, it passes the placental barrier and has been detected in maternal milk. Animal data suggests that it may cause cancer.  It may also affect genetic material (mutagenic).

132.    Some testing classifies ***paraffinum liquidum ((mineral oil) huile minerale)*** as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons.  It is classified as a skin irritant.  It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.  It is a Category 1A Carcinogen, meaning that it is known to induce cancer or increase its incidence in humans, based on human data. It is a Category 2 germ cell mutagen, meaning that it is suspected of mutating human cells in a way that can be transmitted to children conceived after exposure. It is a teratogen, meaning that it causes birth defects. It is also classified by federal regulations as a toxic and hazardous compound.

133.    ***Lanolin ((lanolin acid) cire de lanoline)*** causes allergic dermatitis on topical

exposure to human skin. It is also a suspected skin or sense organ toxicant.

134. Some testing classifies *lauric acid* as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons. It is classified as a skin irritant, and it causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.

135. *Avobenzone* is a skin sensitizer, known to cause allergic or photo-allergic contact dermatitis. Nonetheless, it makes up as much as 3% of Almay products labeled as "hypoallergenic."

136. Animal testing confirms that *triethyl citrate* is a skin sensitizer.

137. Animal testing confirms that *linoleic acid* is a skin sensitizer. It causes Category 1C skin corrosion, meaning that it irreversibly damages the skin after short exposure; in animal tests, the substance caused visible necrosis after less than 4 hours of exposure. Corrosive reactions are typified by ulcers, bleeding, bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars. It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.

138. Some testing classifies *aluminum powder (ci 77000)* as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons. It is also regulated under federal law as a toxic and hazardous substance.

139. Some testing classifies *cera microcristallina* (also listed as microcrystalline wax or cire microcristalline) as a Category 1 skin sensitizer, based on positive animal and/or human testing

demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons.

140. Human and animal tests confirm that ***hydrogenated polydecene*** is a skin sensitizer.

141. ***Alumina*** is classified as a skin and eye irritant. According to some tests, it is a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons. Animal data indicates that it may cause cancer.

142. ***Bis-diglyceryl polyacyladipate-2*** is a skin sensitizer, based on positive human testing.

143. ***Blue 1 Lake (CI 42090) (also listed as Blue 1 (CI 42090))*** has been found to be a moderate skin sensitizer (based on guinea pig testing). It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days. It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

144. In animal testing, ***acrylates/C10-30 alkyl acrylate crosspolymer*** was shown to be a sensitizer at concentrations as low as 2%. It also causes eye irritation that takes three days to clear.

### 3. Additional Chemicals Found to be Skin or Eye Irritants

145. Additionally, ***all*** Almay's Falsely Labeled Products ***also*** contain one or more of the following ***additional*** chemicals, which are skin or eye irritants (and some of which may also be skin sensitizers):

146. ***Oligopeptide-24*** is a combination of amino acids, several of which have not been

assessed by any reputable authority, but, based on their chemical structure and similarity to other known skin sensitizers, are classified as likely skin sensitizers. Several of the constituent parts are also known to be Category 2 skin irritants, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days. Some are also suspected skin or sense organ toxicants. Several of the constituent parts are also Category 2 eye irritants, causing adverse effects on the cornea, iris, and conjunctiva. Several of the constituent parts are teratogens, meaning that they cause birth defects.

147. *1, 2-hexanediol* is a Category 2A eye irritant, causing corneal opacity, iritis, conjunctival redness, or conjunctival edema, lasting 7-21 days.

148. The safety profile of *acrylates copolymer* has not been thoroughly investigated. The limited testing done by the ingredient manufacturers, however, indicates that it is a skin irritant and eye irritant, causing skin damage in less than four hours and serious irritation to the cornea, iris, and conjunctiva. It is also a suspected mutagen.

149. *Alanine* is a skin and eye irritant, and is suspected to be toxic to reproduction. Based on its chemical structure and similarity to other known skin sensitizers, alanine is classified as a likely skin sensitizer.

150. The sensitization characteristics of *aluminum hydroxide* have not been assessed by any reputable authority. The limited testing done of aluminum hydroxide shows it to be a skin and eye irritant, and very toxic to aquatic life with long-lasting effects.

151. *Aluminum sesquichlorohydrate* causes Category 1A skin corrosion, meaning that it irreversibly damages the skin after short exposure; in animal tests, the substance caused visible necrosis after less than 3 minutes of exposure. Corrosive reactions are typified by ulcers, bleeding,

bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars. It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application. Nonetheless, it makes up to 25% of Almay products labeled as "hypoallergenic."

152. The sensitization potential of ***aminomethyl propanediol*** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a likely skin sensitizer. It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days. It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

153. ***Ammonium hydroxide*** causes Category 1A skin corrosion, meaning that it irreversibly damages the skin after short exposure; in animal tests, the substance caused visible necrosis after less than 3 minutes of exposure. Corrosive reactions are typified by ulcers, bleeding, bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars. It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application. It is toxic by definition under federal law, based on animal testing demonstrating that the substance is lethal even in very small doses. It is regulated under federal law as a hazardous substance.

154. The sensitization potential of ***ascorbyl palmitate*** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin

sensitizers, it is a likely skin sensitizer. In fact, it has caused sensitization reactions in human tests. It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days. It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva. It is also harmful to aquatic life with long lasting effects.

155. ***Behentrimonium methosulfate*** has not been studied for skin sensitizing potential. However, it is closely related to behentrimonium chloride, which is a sensitizer. It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days. It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application. It is also very toxic to aquatic life.

156. The safety of ***C13-16 isoparaffin*** has not been adequately studied, and it has not been found to be non-sensitizing by any reputable authority. It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days. It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

157. The safety of ***C13-14 isoparaffin*** has not been adequately studied. The limited testing completed, however, demonstrates that it is a skin irritant and eye irritant, causing skin damage in less than four hours and serious irritation to the cornea, iris, and conjunctiva. Some tests indicate that it causes Category 1B skin corrosion, meaning that it irreversibly damages the

skin after short exposure; in animal tests, the substance caused visible necrosis after less than 1 hour of exposure. Corrosive reactions are typified by ulcers, bleeding, bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars.

158. ***C10-13 isoparaffin*** is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days.

159. ***Butylene glycol*** has produced sensitization responses in human tests. It is also classified as a skin and eye irritant.

160. ***Laureth-4, laureth-7, and laureth-23*** have caused allergic skin reactions in humans. They are also classified as a suspected skin sensitizers, based on their chemical structure and similarity to other known skin sensitizers that produce erythema in animal tests. They cause Category 1A skin corrosion, meaning that these chemicals irreversibly damage the skin after short exposure; in animal tests, the substances caused visible necrosis after less than 3 minutes of exposure. Corrosive reactions are typified by ulcers, bleeding, bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars. They also cause Category 1 eye damage, *i.e.*, serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application. They are suspected target organ systemic toxins, and they are highly toxic to aquatic life with long lasting effects. They are ethylene glycol ethers, which are known to be toxic to the environment and to human health, *e.g.*, known to cause wasting of the testicles, reproductive changes, infertility, and changes to kidney function.

161. ***Zinc stearate*** is a Category 2B eye irritant, causing corneal opacity, iritis,

conjunctival redness, or conjunctival edema, reversible in 7 days.   In fact, in an internal document defining the term "hypoallergenic," Almay lists zinc stearate as a "known" allergen" that it deems unacceptable in hypoallergenic products. Exhibit B.

162.   ***Zinc oxide (CI 77947)*** is a skin and eye irritant, a reproductive toxin that is known to damage fertility or the unborn child based on human evidence, a carcinogen that is known to induce cancer or increase its incidence in humans, based on human evidence, a suspected germ cell mutagen, *i.e.*, it is suspected of mutating human cells in a way that can be transmitted to children conceived after exposure. It is also very toxic to aquatic life with long lasting effects.   Some testing indicates that it is a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons, and that it causes Category 1B skin corrosion, meaning that it irreversibly damages the skin after short exposure; in animal tests, the substance caused visible necrosis after less than 1 hour of exposure. Corrosive reactions are typified by ulcers, bleeding, bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars, and Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.   It is a Category 2 reproductive toxin, meaning that it is suspected of damaging fertility or the unborn child based on human or animal evidence. It is a teratogen, meaning that it causes birth defects.   Nonetheless, it makes up as much as 4.2% of Almay products

163.   ***Zea mays (corn) starch*** is classified as a skin and eye irritant.   In fact, in an internal document defining the term "hypoallergenic," Almay lists corn starch as a known allergen unacceptable in hypoallergenic products.   *See* Exhibit B.

164.   **Urea** is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days. It is also a Category 2 eye irritant, causing adverse effects on the cornea, iris, conjunctiva.

165.   The sensitization potential of **trisodium EDTA** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a likely skin sensitizer.  It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days.  It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

166.   The sensitization characteristics of **trihydroxystearin** have not been assessed by any reputable authority.  The information gap has caused one trade association to issue an announcement that insufficient data exists for the ingredient's safety in cosmetic products.  The limited testing completed, however, demonstrates that trihydroxystearin is a skin irritant and eye irritant, causing skin damage in less than four hours and serious irritation to the cornea, iris, and conjunctiva.

167.   The sensitization potential of **triethoxycaprylylsilane** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a likely skin sensitizer.  The little testing done on triethoxycaprylylsilane shows it to be highly irritating to the skin; in animal tests, it has caused erythema, edema, necrosis, fissuring, desquamation and alopecia. Animal tests also show it to be an eye irritant.

168.   **Tridecyl trimellitate** is a skin and eye irritant.

169. The sensitization characteristics of **tribehenin** have not been adequately assessed by any reputable authority. The limited testing done on **tribehenin** demonstrates that it is a skin irritant.

170. **Triacontanyl PVP** is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

171. **Titanium dioxide (CI 77891)** is classified as a skin irritant. It is a Category 2B eye irritant, causing corneal opacity, iritis, conjunctival redness, or conjunctival edema, reversible in 7 days. It is a Category 2 Carcinogen, meaning that it is suspected of inducing cancer or increasing its incidence. When titanium dioxide is respirable, as it is in Almay's products, it is classified as a possible/probable carcinogen. In fact, the National Institute for Occupational Safety and Health (NIOSH) determined that concentrations of titanium dioxide as low as 5,000 mg per cubic meter is immediately dangerous to life or health, meaning it poses an immediate threat to life, would cause irreversible adverse health effects, or would impair an individual's ability to escape from a dangerous atmosphere. Nonetheless, titanium dioxide makes up as much as 7.1% of Almay products.

172. **Talc** is an eye and skin irritant, and a possible human carcinogen.

173. The sensitization potential of **steareth-2 and steareth-21** have not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a suspected skin sensitizer. It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.

174. **Sorbitan trioleate** is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the

skin) lasting more than three days, or skin inflammation lasting longer than 14 days. When applied to rabbit skin, sorbitan trioleate produced erythema, edema, and thickening of the skin. It is also a Category 2 eye irritant, causing adverse effects on the cornea, iris, conjunctiva.

175. ***Sodium potassium aluminum silicate*** is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days. It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.

176. Based on human evidence, ***sorbitan laurate*** has caused contact dermatitis at concentrations as low as 2%. It is also a known skin and eye irritant.

177. The sensitization potential of ***sodium trideceth sulfate*** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a suspected skin sensitizer. It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days. It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application. It is also harmful to aquatic life with long lasting effects.

178. ***Sodium phosphate*** is classified as a skin and eye irritant.

179. Repeated skin contact with ***sodium hydroxide*** is known to cause dermatitis. It also causes serious skin corrosion, irreversibly damaging the skin. Concentrations as low as 5% cause Category 1A skin corrosion, meaning that it irreversibly damages the skin after short exposure; in animal tests, the substance caused visible necrosis after less than 3 minutes of exposure. Corrosive

reactions are typified by ulcers, bleeding, bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars. Even minute amounts (0.5%) are irritating to the skin and eyes. It is also a suspected skin or sense organ toxicant. It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.  It is regulated by numerous federal laws as a toxic and hazardous substance.  It is also federally regulated as a hazardous substance which, when discharged to navigable waters or adjoining shorelines (as by, *e.g.*, washing Almay's product off the body), present an imminent and substantial danger to the public health or welfare.

180.   ***Sodium cocoyl glutamate*** is a severe eye irritant.

181.   The sensitization potential of ***simethicone*** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a likely skin sensitizer.   It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

182.   ***Silica*** causes Category 1C skin corrosion, meaning that it irreversibly damages the skin after short exposure; in animal tests, the substance caused visible necrosis after less than 4 hours of exposure. Corrosive reactions are typified by ulcers, bleeding, bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars.   It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

183.   ***Scutellaria baicalensis root extract*** is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14

days. It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

184.    ***Ricinus communis (castor) seed oil*** has been associated with allergic contact dermatitis from its use in cosmetic products. Based on its chemical structure and similarity to other known skin sensitizers, it is classified as a suspected skin sensitizer. It is also classified as a skin and eye irritant.

185.    The safety of ***bismuth oxychloride (CI 77163)*** has not been adequately studied, and it has not been found to be non-sensitizing by any reputable authority.   It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days.  It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

186.    ***Black 2 (CI 77266)*** is a skin and eye irritant.  It is a Category 2 Carcinogen, meaning that it is suspected of inducing cancer or increasing its incidence.

187.    ***Caprylyl glycol*** causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.

188.    The sensitization potential of ***carmine (CI 75470)*** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a likely skin sensitizer.  It causes Category 1A skin corrosion, meaning that it irreversibly damages the skin after short exposure; in animal tests, the substance caused visible necrosis after less than 3 minutes of exposure. Corrosive reactions are typified by ulcers, bleeding, bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars.  It causes Category 1 eye damage, *i.e.*, it causes

serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.

189.    The sensitization properties of **ceteareth-20, ceteareth-12, and ceteareth-6** have not been thoroughly investigated.  The limited testing done, however, indicates that they are Category 2 skin irritants, meaning that they cause significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days.  They cause Category 1 eye damage, *i.e.*, serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application. They are very toxic to the aquatic environment and toxic by definition under federal law, based on animal testing demonstrating that the substances are lethal even in very small doses.

190.    The sensitization potential of **cetearyl glucoside** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a likely skin sensitizer.  It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days.  It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.  It is also very toxic to aquatic life.

191.    **Cetyl alcohol** has caused urticaria-like dermatitis in humans. It is also a skin and eye irritant, and it is inherently toxic to aquatic life with long-lasting effects.

192.    While **citric acid** is a common food ingredient, skin contact is known to cause allergic reactions in humans. It has been reported to cause Category 1B skin corrosion, meaning

that it irreversibly damages the skin after short exposure; in animal tests, the substance caused visible necrosis after less than 1 hour of exposure. Corrosive reactions are typified by ulcers, bleeding, bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars. It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.

193. ***Cyclopentasiloxane*** has not adequately been tested for its sensitization profile. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a likely skin sensitizer. The limited testing completed, however, demonstrates that it is a skin irritant and eye irritant, causing skin damage in less than four hours and serious irritation to the cornea, iris, and conjunctiva.

194. The sensitization potential of ***dibutyl adipate*** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a suspected skin sensitizer. It is also a skin irritant. It is a Category 2 reproductive toxin, meaning that it is suspected of damaging fertility or the unborn child based on human or animal evidence. It is a teratogen, meaning that it causes birth defects.

195. The safety of ***dicaprylyl ether*** has not been adequately studied, and it has not been found to be non-sensitizing by any reputable authority. The limited testing completed, however, demonstrates that it is a skin irritant.

196. The sensitization potential of ***dimethicone*** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a likely skin sensitizer. The limited testing of dimethicone demonstrates that it causes Category 1A skin corrosion, meaning that it irreversibly damages the skin after short

exposure; in animal tests, the substance caused visible necrosis after less than 3 minutes of exposure. Corrosive reactions are typified by ulcers, bleeding, bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars. It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application. It is presumed to cause damage to organs after generally moderate exposure, and it is suspected of damaging fertility or the unborn child based on human or animal evidence. It is a teratogen, meaning that it causes birth defects, and it is a potential carcinogen (uterine tumors). It is inherently toxic to aquatic life, hazardous to the environment, and environmentally persistent (*i.e.*, not biodegradable).

197. ***Dimethicone/bis-isobutyl PPG-20 crosspolymer*** is a skin irritant.

198. ***Dimethiconol*** has been shown to be sensitizing in industry tests. Moreover, it is classified by federal law as acutely toxic through skin contact. It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva. It is also very ecotoxic to terrestrial invertebrates.

199. The safety of ***dipentaerythrityl tetrahydroxystearate/tetraisostearate*** has not been adequately studied, and it has not been found to be non-sensitizing by any reputable authority. The limited analysis completed by the supplier (The Nisshin OilliO Group, Ltd. and Ikeda Corp. of America), however, discloses that it is a skin and/or eye irritant.

200. The sensitization potential of ***dipropylene glycol*** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is a likely skin sensitizer. In fact, the limited testing completed on dipropylene glycol demonstrates that it does cause sensitization reactions in humans. It is classified as a skin

irritant. It is also suspected to be toxic to reproduction.

201. The sensitization potential of **disodium EDTA** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a likely skin sensitizer. The limited testing completed also demonstrates that it is a skin irritant and eye irritant, causing skin damage in less than four hours and serious irritation to the cornea, iris, and conjunctiva. It is a teratogen, meaning that it causes birth defects. It is also suspected of being a mutagen and reproductive toxin.

202. **Disodium phosphate** has not been found to be non-sensitizing by any reputable authority. It has, however, been found to be a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days. It is also a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

203. **Ethylhexyl palmitate** is classified as a skin and eye irritant.

204. In photosensitization studies, **ethylhexyl stearate** has been found to cause skin reactions. It has not been found to be non-sensitizing by any reputable authority. It is classified as a skin and eye irritant.

205. **Ethylhexylglycerin** causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application. It is also toxic to aquatic organisms, with long-term adverse effects.

206. **Glycerin** is known to cause eczema in humans. Based on its chemical structure and similarity to other known skin sensitizers, it is a suspected skin sensitizer. **Glycerin** is classified as a skin and eye irritant. It is a mutagen, meaning that it is suspected of mutating human cells in a way that can be transmitted to children conceived after exposure.

207.   ***Glyceryl stearate*** is a skin and eye irritant. In animal testing (rabbits), it caused erythema, edema, atonia, desquamation, and/or fissuring.  It is also inherently toxic to aquatic life.

208.   The sensitization potential of ***red 40 (CI 16035), or red 40 lake (CI 16035)*** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a likely skin sensitizer.  The limited testing performed on this ingredient demonstrates that it is a skin irritant and eye irritant.

209.   The sensitization potential of ***quaternium-22*** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is a likely skin sensitizer (based on allergic contact dermatitis in guinea pigs and humans). Animal and human testing demonstrates that quaternium-22 is a skin irritant.  In fact, when the acute toxicity of quaternium-22 was tested on rabbits, at a 1% concentration for 7 hours a day, scientists had to stop the test procedure at day four because all the test animals exhibited extreme dermal irritation.  In another test, a concentration of 1% quaternium-22 caused skin irritation ranging from pimples to inflammatory papular acne lesions in eight of the fifty female volunteers.

210.   The sensitization characteristics of ***propylene glycol dicaprylate/dicaprate*** have not been assessed by any reputable authority. The limited testing done, however, indicates that it is a skin irritant.

211.   The sensitization potential of ***propylene carbonate*** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a likely skin sensitizer. The limited human testing done of propylene carbonate has produced some sensitization reactions, and frequently caused skin irritation.  It is classified as a skin irritant.  It is a Category 2A eye irritant, causing corneal opacity, iritis,

conjunctival redness, or conjunctival edema, lasting 7-21 days.

212. The sensitization potential of ***propanediol*** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a likely skin sensitizer. Animal testing demonstrates it to be slightly irritating to the skin. It is a mutagen, meaning that it is suspected of mutating human cells in a way that can be transmitted to children conceived after exposure.

213. The sensitization potential of ***potassium sorbate*** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a likely skin sensitizer. Some case studies show it to cause contact urticaria. It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days. Some studies show it to cause Category 1A skin corrosion, meaning that it irreversibly damages the skin after short exposure; in animal tests, the substance caused visible necrosis after less than 3 minutes of exposure. Corrosive reactions are typified by ulcers, bleeding, bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars. It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva. It is also a suspected mutagen.

214. ***Potassium cetyl phosphate*** is a skin irritant, causing skin damage in less than four hours. It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application. It is suspected to be toxic to reproduction.

215. ***Polysorbate 80*** is classified as a skin and eye irritant. It is a mutagen, meaning

that it is suspected of mutating human cells in a way that can be transmitted to children conceived after exposure.

216.    The sensitization characteristics of ***polymethylsilsesquioxane*** have not been assessed by any reputable authority. The limited testing done, however, indicates that polymethylsilsesquioxane is a skin irritant, causing erythema and dryness.

217.    The sensitization potential of ***polymethyl methacrylate*** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a suspected skin sensitizer.  It has also been reported to be a skin and eye irritant.

218.    The sensitization potential of ***polyglyceryl-3 diisostearate*** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a suspected skin sensitizer.  It is also classified as a skin and eye irritant.

219.    ***Hydrogenated polyisobutene*** is a skin irritant; at concentrations as low as 1.44% or 4% have caused erythema.

220.    The sensitization potential of ***phenyl trimethicone*** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a likely skin sensitizer.  It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days.  It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

221.    The sensitization potential of ***pentylene glycol*** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin

sensitizers, it is a likely skin sensitizer. In fact, pentylene glycol has been shown to be sensitizing in case reports. It is classified as a skin irritant. It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.

222. Industry-led testing shows that ***PEG/PPG-19/19 dimethicone and PEG/PPG-18/18 dimethicone*** are skin irritants; animal testing (rabbits) shows that they caused irritation in a majority of test subjects. These ingredients have not been adequately assessed for sensitization. They are both made in part with ethylene oxide, resulting in 1,4 dioxane as a trace contaminant, which is classified as a possible carcinogen.

223. The sensitization characteristics of ***PEG-26-PPG-30 phosphate*** have not been assessed by any reputable authority. The limited testing done, however, indicates that it is a skin and eye irritant, causing skin damage in less than four hours. Some testing indicates that it causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application. It is made in part with ethylene oxide, resulting in 1,4 dioxane as a trace contaminant, which is classified as a possible carcinogen.

224. The sensitization potential of ***PEG-12 dimethicone crosspolymer*** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a likely skin sensitizer. PEG-12 dimethicone crosspolymer is classified as a skin and eye irritant. It is made in part with ethylene oxide, resulting in 1,4 dioxane as a trace contaminant, which is classified as a possible carcinogen. It is a Category 2 reproductive toxin, meaning that it is suspected of damaging fertility or the unborn child based on human or animal evidence.

225. The sensitization potential of ***PEG-100 stearate*** has not been assessed by any

reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a suspected skin sensitizer.  It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days.  It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.  It is made in part with ethylene oxide, resulting in 1,4 dioxane as a trace contaminant, which is classified as a possible carcinogen.

226. **PEG-10 dimethicone** is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva. It is made in part with ethylene oxide, resulting in 1,4 dioxane as a trace contaminant, which is classified as a possible carcinogen.

227. **Paraffin** (also listed as synthetic wax) has produced sensitization reactions in humans.  It is classified as a skin irritant.  It is a Category 2B eye irritant, causing corneal opacity, iritis, conjunctival redness, or conjunctival edema, reversible in 7 days.

228. The sensitization potential of **panthenol** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is a likely skin sensitizer. In fact, it has produced allergic responses in some past testing on humans.  Panthenol is classified as a skin and eye irritant.

229. **Ozokerite (also listed as ceresin)** is classified as a skin and eye irritant.

230. **Oleyl alcohol** has been found to cause skin sensitization after prolonged contact, based on human patch test studies. It is classified as a suspected skin sensitizer. It is also classified as a skin and eye irritant.

231. **Octisalate** is classified as a skin and eye irritant.  Nonetheless, it makes up to 5% of Almay products labeled as "hypoallergenic"

232. **Nylon-6** is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days. It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

233. The sensitization potential of **nylon-12** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a likely skin sensitizer. It is also classified as a skin and eye irritant.

234. The safety of **mica** has not been adequately studied, and it has not been found to be non-sensitizing by any reputable authority. Some tests indicate it causes Category 1B skin corrosion, meaning that it irreversibly damages the skin after short exposure; in animal tests, the substance caused visible necrosis after less than 1 hour of exposure. Corrosive reactions are typified by ulcers, bleeding, bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars. It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

235. **Hydroxyethylcellulose** is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days. It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

236. The sensitization potential of **isopropanolamine** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a likely skin sensitizer. It causes Category 1B skin corrosion, meaning that it irreversibly damages the skin after short exposure; in animal tests, the substance caused visible necrosis after less than 1 hour of exposure. Corrosive reactions are typified by ulcers,

bleeding, bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars. It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.

237. The sensitization potential of ***isopropyl alcohol*** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a likely skin sensitizer. It causes Category 1C skin corrosion, meaning that it irreversibly damages the skin after short exposure; in animal tests, the substance caused visible necrosis after less than 4 hours of exposure. Corrosive reactions are typified by ulcers, bleeding, bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars. It is also a suspected skin or sense organ toxicant. It is a Category 2A eye irritant, causing corneal opacity, iritis, conjunctival redness, or conjunctival edema, lasting 7-21 days. It is a Category 2 reproductive toxin, meaning that it is suspected of damaging fertility or the unborn child based on human or animal evidence. It is a teratogen, meaning that it causes birth defects.

238. ***Isopropyl palmitate*** is classified as a skin and eye irritant. Moreover, it is an ester, a class of chemicals known to be environmentally toxic.

239. The sensitization potential of ***isostearic acid*** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a suspected skin sensitizer. It is also a skin irritant, causing skin damage in less than four hours. In Europe, it is prohibited from being added to cosmetic or bodycare products.

240. The sensitization profile of ***kaolin*** has not been adequately studied, and it has not been found to be non-sensitizing by any reputable authority. It is a Category 2 skin irritant,

meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days.  It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

241.    The sensitization potential of ***lysine hcl*** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a likely skin sensitizer.  It is also classified as a skin and eye irritant.

242.    The sensitization potential of ***magnesium aluminum silicate*** has not been assessed by any reputable authority.  The limited testing completed, however, indicates that magnesium aluminum silicate is a skin irritant.

243.    The sensitization profile of ***magnesium stearate*** has not been adequately studied, and it has not been found to be non-sensitizing by any reputable authority. The limited testing done on magnesium stearate shows it to be a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days.  It is also a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

244.    Studies show that ***methicone*** is an eye irritant, causing eye irritation lasting up to two days.  Methicone has not been found to be non-sensitizing by any reputable authority.

245.    ***Methoxy amodimethicone/silsesquioxane copolymer*** is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days.  It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of

application.

246.    Repeated exposure to ***petrolatum*** has caused dermatitis in some human subjects.   It is a Category 2B eye irritant, causing corneal opacity, iritis, conjunctival redness, or conjunctival edema, reversible in 7 days.   It is a Category 1B Carcinogen, meaning that it is presumed to induce cancer or increase its incidence in humans, based on animal data. It is a reproductive toxin, suspected of damaging fertility or the unborn child based on human or animal evidence of skin contact.   It is also environmentally persistent. In Europe, it is prohibited from being added to cosmetic or bodycare products.

247.    ***Sucrose cocoate*** is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

248.    Case studies demonstrate that ***hyaluronic acid*** has caused allergic reactions in humans. It can also cause skin irritation from topical use, including erythema and a skin rash.

249.    ***Red 33 Lake (CI 17200), also listed as Red 33 (CI 17200),*** is a known skin irritant.   Like most of Almay's ingredients, it has not been assessed for skin sensitization.

250.    The sensitization characteristics of ***PEG-9 polydimethylsiloxyethyl dimethicone*** have not been assessed by any reputable authority. The limited animal testing done, however, indicates that it is a skin irritant, causing scaling of the skin.   It is made in part with ethylene oxide, resulting in 1,4 dioxane as a trace contaminant, which is classified as a possible carcinogen.

251.    The sensitization characteristics of ***dimethicone/PEG-10/15 crosspolymer*** have not been assessed by any reputable authority. The limited testing done, however, indicates that it is a skin irritant.   It is made in part with ethylene oxide, resulting in 1,4 dioxane as a trace contaminant, which is classified as a possible carcinogen.

252.    The sensitization potential of ***sodium citrate*** has not been assessed by any reputable

authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a suspected skin sensitizer. It is also classified as a skin and eye irritant, causing significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days, and causing adverse effects on the cornea, iris, and conjunctiva.

253. *Iron oxides (CI 77491)* is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days. It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application. It is regulated by federal law as a toxic and hazardous substance.

254. The sensitization characteristics of *CI 77492* have not been assessed by any reputable authority. The limited testing done, however, indicates that it causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.

255. The sensitization characteristics of *CI 77499* have not been assessed by any reputable authority. The limited testing done, however, indicates that it is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days. It is also a Category 2 eye irritant, causing adverse effects on the cornea, iris, conjunctiva. Some tests indicate that CI 77499 causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.

256. ***Isopropyl titanium triisostearate*** is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days. It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

257. The sensitization potential of ***glycyrrhetinic acid*** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a suspected skin sensitizer. It is classified as a skin irritant. It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

258. ***Palmitic acid*** is classified as a skin and eye irritant.

259. ***Red 28 Lake (CI 45410)*** is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva. It is a teratogen, meaning that it causes birth defects.

260. ***Yellow 6 lake (CI 15985)*** has produced allergenic responses in humans. It is also a skin and eye irritant.

261. ***Homosalate*** is a skin irritant and eye irritant, causing skin damage in less than four hours and serious irritation to the cornea, iris, and conjunctiva. Nonetheless, it makes up as much as 5% of Almay products labeled as "hypoallergenic."

262. The safety of ***sodium lignosulfonate*** has not been adequately studied, and it has not been found to be non-sensitizing by any reputable authority. It is classified as a skin irritant. It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

263. The sensitization potential of ***sodium laureth-11 carboxylate*** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a suspected skin sensitizer. It is a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal

accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days. It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.

264. The sensitization potential of ***sodium dehydroacetate*** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a suspected skin sensitizer. It is also a skin and eye irritant. It is a teratogen, meaning that it causes birth defects.

265. ***Methylcellulose*** is a skin irritant, eye irritant, and some studies report it to cause skin sensitization.

266. ***Retinyl palmitate*** is irritating to the skin. In fact, in one test, a 0.1% concentration caused slight to moderate erythema and edema in all the test animals in the first week. Later, all the test animals also developed slight to moderate desquamation. It is a teratogen, meaning that it causes birth defects.

267. The sensitization potential of ***acetyl hydroxyproline*** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a likely skin sensitizer. It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.

268. The sensitization characteristics of ***hectorite*** have not been assessed by any reputable authority. The limited testing done, however, indicates that it is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva.

269. ***Squalane*** is classified as a skin and eye irritant.

270. The sensitization potential of **EDTA** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is a likely skin sensitizer. According to some studies, direct contact with EDTA causes dermal sensitization (eczema) or allergic conjunctiva. It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, and conjunctiva. It is a mutagen, meaning that it is suspected of mutating human cells in a way that can be transmitted to children conceived after exposure. It is a Category 2 reproductive toxin, meaning that it is suspected of damaging fertility or the unborn child based on human or animal evidence. It is a teratogen, meaning that it causes birth defects. It is also regulated by federal law as a hazardous substance.

271. Some of Almay's other ingredients may also be sensitizers, depending on the chemical used. Specifically, Almay does not disclose the identity of the fragrances it uses, listing only the generic **"aroma" or "flavor"** on its product label. Many synthetic fragrances are known to be human sensitizers, toxins and environmental hazards, and are associated with adverse reproductive effects, genetic mutations, and other ill effects. Almay also adds "**carbomer**" to its products, but does not specify what substance it is adding. "Carbomer" could refer to Carbomer 934, which is a sensitizer that irreversibly damages the skin after short exposure; in animal tests, the substance caused visible necrosis after less than 3 minutes of exposure. Corrosive reactions are typified by ulcers, bleeding, bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars. Some studies indicate that Carbomer 934 is a germ cell mutagen known or presumed to mutate human cells in a way that can be transmitted to children conceived after exposure. Some studies indicate that it is also a carcinogen. Or "carbomer" could refer to carboxypolymethylene, Carbomer 940, or Carbomer 941, all of which lack sufficient safety testing. All carbomers contain 0.1-0.5% benzene,

a known human carcinogen that causes acute central nervous system damage and chronic bone marrow damage.

**E.    The Representations Are False, Deceptive, and Misleading**

272.    Almay's conduct deceived and/or was likely to deceive the public.  Consumers were deceived into believing that the Falsely Labeled Products were hypoallergenic, as labeled.

273.    All these representations were false, as explained above.

274.    Consumers would not know the true nature of the ingredients merely by reading the ingredient label.  Discovery of the true nature of the ingredients requires investigation beyond the grocery store and knowledge of chemistry beyond that of the average reasonable consumer.

**F.    Location of the Misrepresentations**

275.    Almay made the above false, deceptive, and misleading misrepresentations and omissions on the package of the Falsely Labeled Products.  *See* Exhibit A.

276.    The misrepresentations and omissions were uniform and have actually been communicated to Plaintiff and to each member of the Class at every point of purchase and use.

**G.    Almay's Deceptive and Misleading Omissions**

277.    Almay deceptively and misleadingly conceals other material facts about the Falsely Labeled Products, including:

a.    the true nature of the Falsely Labeled Products' ingredients;

b.    the identity of the Falsely Labeled Products' ingredients;

c.    that the Falsely Labeled Products contain sensitizers, irritants, toxins, carcinogens, pollutants, and/or otherwise hazardous substances;

d.    the concentration of the sensitizers, irritants, toxins, carcinogens, pollutants, and/or otherwise hazardous substances in the Falsely Labeled Products;

e.      that the Falsely Labeled Products are not "hypoallergenic";

f.      that the Falsely Labeled Products are not what a reasonable consumer would consider to be "hypoallergenic;"

g.      that the Falsely Labeled Products contain chemicals that a reasonable consumer would not expect in a product labeled as "hypoallergenic."

278.    Plaintiff and the members of the Class are not at fault for failing to discover Almay's wrongs earlier and had no actual or presumptive knowledge of facts sufficient to put them on inquiry notice.

279.    Almay has concealed the identity of several ingredients.  Discovery is therefore necessary to determine their identity.  These ingredients may also be sensitizers, irritants, or otherwise toxic.

280.    For example, Almay adds "*aroma*" or "*flavor*" to its products but does not identify what chemical is used. Many ingredients used as flavors or fragrances are known skin sensitizers. Many are also extremely toxic to a person's skin, their overall health, and/or to the environment.

281.    Furthermore, Almay has not disclosed the concentration of each ingredient in its products. Further investigation and discovery is needed so that Plaintiff can ascertain whether entire products are also toxic.

282.    Almay has also concealed from consumers the nature of its products' ingredients despite consumers' requests.  The possible carcinogenic, toxic, and environmental effects of its ingredients are still concealed from consumers today.

283.    These facts are not ascertainable and are still not known to Plaintiff, the Class members, and reasonable consumers. Almay's concealment tolls the applicable statute of limitations.

284.    To this day, Almay continues to conceal and suppress the existence, true identity, nature, and concentration of the sensitizers, irritants, toxins, carcinogens, pollutants, and/or otherwise hazardous substances in the Falsely Labeled Products.

285.    Similarly, to this day, Almay continues to conceal and suppress the fact that the Falsely Labeled Products are not "hypoallergenic" as promised.

286.    Almay fails to disclose, however, that many ingredients in its products are known skin allergens, even though they are not banned by Almay's list of "unacceptable ingredients." Exhibit B.

## H.    Almay Knew Its Representations Were False

287.    Almay holds itself out to the public as trusted experts in the area of hypoallergenic, safe, mild, and gentle personal care products.

288.    Almay knew what representations it made regarding the Falsely Labeled Products, as all representations appear on the products' packages.

289.    Almay also knew what ingredients were added to each product, as (presumably) all product ingredients listed on the product packages and are further disseminated on their websites.

290.    Almay is governed by and thus is presumed to know the federal regulations and state laws that control the labeling of the Falsely Labeled Products, and thus is aware that many of the ingredients have been federally declared to be chemical compounds that require inventory reporting under the Toxic Substance Control Act, are hazardous or toxic compounds that require special disclosures on safety data sheets, or are carcinogens or reproductive toxins that require product label warnings under state law.

291.    Almay thus knew all the facts demonstrating that its Falsely Labeled Products contain sensitizers, irritants, and otherwise toxic ingredients, and that these products were therefore

falsely labeled.

**I.**     **Almay Intended Consumers To Rely**

292.    As Almay knows, consumers prefer hypoallergenic products. As Almay knows, consumers will pay a premium for hypoallergenic products or would not purchase these products at all unless they were hypoallergenic, as advertised.

293.    Almay advertises its products as meeting the unique needs of consumers who have or might develop skin sensitivities, and intends consumers rely on its "hypoallergenic" representations:

> The company's products have filled an important need for those individuals who have or may have developed a sensitivity to one or more of the substances used in cosmetic products and for those individuals who may become sensitized from repeated use of products that contain sensitizing substances. Almay's products are specially prepared from carefully selected ingredients to minimize the presence of all known allergens. Every product and shade is subjected to patch tests and no positive reaction are accepted.

Exhibit B.

294.    Almay's misleading affirmative statements further obscured what Almay failed to disclose. Thus, reliance upon Almay's misleading and deceptive representations and omissions may be presumed.

295.    Almay made the false, deceptive, and misleading representations and omissions, intending Plaintiff and Class members to rely upon these representations and omissions in purchasing and using one or more Falsely Labeled Products.

296.    In making the false, misleading, and deceptive representations and omissions at issue, Almay knew and intended that consumers would purchase the Almay products when consumers would otherwise purchase a competing product or employ an alternate regimen (such as using an oil for moisturizing).

297.     In making the false, misleading, and deceptive representations and omissions at issue, Almay also knew and intended that consumers would pay a premium for hypoallergenic products, furthering Almay's private interest of increasing sales of its products and decreasing the sales of products marketed by its competitors.

## J.     Consumers Reasonably Relied

298.     Consumers frequently rely on ingredient representations and information in making purchase decisions, especially in purchasing personal care products.

299.     When Plaintiff and the Class members purchased the Falsely Labeled Products, Plaintiff and the Class members saw the false, misleading, and deceptive representations detailed above, and did not receive disclosure of the facts concealed, as detailed above.

300.     These misrepresentations were uniform and were communicated to Plaintiff and every other member of the Class at every point of purchase and use.

301.     Plaintiff and the Class members were among the intended recipients of Almay's deceptive representations and omissions.

302.     Plaintiff and the Class members reasonably relied to their detriment on Almay's misleading representations and omissions.

303.     Almay's false, misleading, and deceptive misrepresentations and omissions deceived and misled, and are likely to continue to deceive and mislead, Plaintiff, the Class members, reasonable consumers, and the general public.

304.     Almay's misleading affirmative statements further obscured what it failed to disclose.  Thus, reliance upon Almay's misleading and deceptive representations and omissions may be presumed.

305.     Almay made the deceptive representations and omissions with the intent to induce

Plaintiff and the Class members to purchase the Falsely Labeled Products. Plaintiff's and the Class members' reliance upon such representations and omissions may be presumed.

306. Almay's deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions. Thus, Plaintiff's and the Class members' reliance upon such representations and omissions may be presumed as a matter of law. The materiality of those representations and omissions also establishes causation between Almay's conduct and the injuries sustained by Plaintiff and the Class members.

**K.** **Almay's Wrongful Conduct Caused Plaintiff' Injury**

307. As an immediate, direct, and proximate result of Almay's false, misleading, and deceptive representations and omissions, Almay injured Plaintiff and the Class members in that they:

a. paid a sum of money for a product that was not as represented;

b. paid a premium price for a product that was not as represented;

c. were deprived the benefit of the bargain because the Falsely Labeled Products they purchased were different from what Almay warranted;

d. were deprived the benefit of the bargain because the Falsely Labeled Products they purchased had less value than what was represented;

e. did not receive a product that measured up to their expectations as created by Almay;

f. used a substance that Plaintiff and the members of the Class did not expect or consent to;

g. used a product that was not hypoallergenic;

h. without their knowing consent, used a substance that is generally harmful to their health;

i. without their knowing consent, used a substance that is a skin sensitizer, irritant, or a known or suspected toxin, carcinogen, mutagen, teratogen, environmental pollutant, or otherwise is harmful to the environment and/or their health.

308. Had Almay not made the false, misleading, and deceptive representations and omissions, Plaintiff and the Class members would not have been injured as listed above. Accordingly, Plaintiff and the Class members have suffered injury in fact as a result of Almay's wrongful conduct.

309. Plaintiff and the Class members all paid money for the Falsely Labeled Products but did not obtain the full value of the advertised products due to Almay's misrepresentations and omissions. Plaintiff and the Class members purchased, purchased more of, or paid more for, the Falsely Labeled Products than they would have had they known the truth about the Falsely Labeled Products. Accordingly, Plaintiff and the Class members have suffered injury in fact and lost money or property as a result of Almay's wrongful conduct.

## L. Almay Benefited From Its Misleading and Deceptive Representations and Omissions

310. As the intended, direct, and proximate result of Almay's false, misleading, and deceptive representations and omissions, Almay has been unjustly enriched through more sales of Falsely Labeled Products and higher profits at the expense of Plaintiff and the Class members. As a direct and proximate result of its deception, Almay also unfairly obtained other benefits, including the higher value associated with a "hypoallergenic" brand and the resulting higher stock value, redirecting sales to it and away from its competitors, and increased sales of its other products.

# V.    CLASS ALLEGATIONS

311.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and all other similarly situated United States residents who purchased the Falsely Labeled Products (the "Class").

312.    Excluded from the Class are the judges assigned to this case and the members of their immediate families, officers and directors of Almay; members of the immediate families of the officers and directors of Almay; Almay's legal representatives, heirs, successors, or assigns; and any entity in which they have or have had a controlling interest.

313.    Plaintiff seeks to certify the Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

314.    At this time, Plaintiff does not know the exact number of the Class members; given the nature of the claims and the number of sales that Almay has made of the Products, Plaintiff believes that members of each Class are so numerous that joinder of all members is impracticable.

315.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

a.    whether Almay misrepresented and/or failed to disclose material facts concerning the Falsely Labeled Products;

b.    whether Almay's conduct was unfair and/or deceptive; and

c.    whether Almay breached an express warranty created through the labeling and marketing of its Falsely Labeled Products.

316.    Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, purchased one or more of Almay's Falsely Labeled Products at a premium

price, relying on Almay's false and misleading representations, and Plaintiff sustained damages from Almay's wrongful conduct.

317.　Plaintiff will fairly and adequately protect the interests of the Class because Plaintiff is similarly situated with, and has suffered similar injuries as, the members of the Class she seeks to represent.　Plaintiff feels that she has been deceived, wishes to obtain redress of the wrong, and wants Almay to be stopped from perpetrating similar wrongs on others.　Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent, and she has retained counsel competent and experienced in conducting complex class action litigation, who were the first to publicly uncover the true scope and extent of Almay's wrongs.　Plaintiff has no interests adverse to those of the Class members and will vigorously prosecute this litigation.

318.　A class action is superior to other available methods for the fair and efficient adjudication of this controversy.　Specifically, no Class member has a substantial interest in individually controlling the prosecution of a separate action.　The damages suffered by each individual Class member likely will be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Almay's conduct.　Thus, it would be virtually impossible for the Class members individually to redress effectively the wrongs done to them.

319.　The prerequisites to maintaining a class action for injunctive or equitable relief are met as Almay has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

320.　Upon information and belief, there are no pending lawsuits concerning the products at issue in this case.　Concentration of the litigation concerning this matter in this Court is desirable,

and the difficulties likely to be encountered in the management of a class action are not great. The resolution of the claims of all Class members in a single forum, and in a single proceeding, would be a fair and efficient means of resolving the issues raised in this litigation.

321.    The prosecution of separate actions by Class members would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Almay.

322.    Almay's conduct is generally applicable to the Class as a whole and Plaintiff seeks, *inter alia*, equitable remedies with respect to the Class as a whole. As such, Almay's systematic policies and practices make declaratory relief with respect to the Class as a whole appropriate.

323.    The Class is specifically identifiable to facilitate provision of adequate notice and there will be no significant problems managing this case as a class action. Notice to the Class can be made through various means, such as in-store leaflets, website notices, Facebook notices, notices on the labels of the packages, and/or direct notice to those consumers for which Almay knows the e-mail or physical mailing address.

## VI.    CAUSES OF ACTION

324.    The allegations in each Cause of Action are repeated and realleged in every other Cause of Action as if set forth in full therein.

## COUNT 1

## Breach of Express Warranty

325.    Almay provided Plaintiff and other members of the Class with written express warranties including, but not limited to, warranties that its Falsely Labeled Products were "hypoallergenic."

326.    These affirmations of fact or promises by Almay relate to the goods and became part of the basis of the bargain.

327.     Plaintiff and members of the Class purchased the Falsely Labeled Products, believing them to conform to the express warranties.

328.     Almay breached these warranties.  This breach resulted in damages to Plaintiff and other members of the Class, who bought Falsely Labeled Products but did not receive the goods as warranted.

329.     As a proximate result of the breach of warranties by Almay, Plaintiff and the other members of the Class did not receive goods as warranted.  Plaintiff and the members of the Class therefore have been injured and have suffered damages in an amount to be proven at trial.  Among other things, Plaintiff and members of the Class did not receive the benefit of the bargain and have suffered other injuries as detailed above.  Moreover, had Plaintiff and the Class members known the true facts, they would not have purchased the products, would have purchased fewer products, or would not have been willing to pay the premium price Almay charged for the products.

WHEREFORE, Plaintiff prays for relief as set forth below.

## COUNT 2

### Unjust Enrichment

330.     As a result of Almay's deceptive, fraudulent, and misleading labeling, advertising, marketing, and sales of the Falsely Labeled Products, Almay was enriched at the expense of Plaintiff and the other members of the Class through the payment of the purchase price for Almay's Falsely Labeled Products.

331.     Under the circumstances, it would be against equity and good conscience to permit Almay to retain the ill-gotten benefits that it received from Plaintiff and the other members of the Class, in light of the fact that the Falsely Labeled Products purchased by Plaintiff and the other members of the Class were not what Almay purported them to be.  Thus, it would be unjust or

inequitable for Almay to retain the benefit without restitution to Plaintiff and the other members of the Class for the monies paid to Almay for such Falsely Labeled Products.

WHEREFORE, Plaintiff prays for relief as set forth below.

## COUNT 3

### Violation of New York's General Business Law § 349

332. This cause of action is brought pursuant to New York General Business Law § 349 on Plaintiff's behalf and on behalf of the Class.

333. Such acts of Almay, as described above, constitute unlawful, deceptive, and fraudulent business acts and practices.

334. Almay has violated, and continues to violate, § 349 of the New York General Business Law, which makes deceptive acts and practices unlawful. As a direct and proximate result of Almay's violation of § 349, Plaintiff and other members of the Class have suffered damages in an amount to be determined at trial.

335. Pursuant to New York General Business Law § 349, Plaintiff seek an order of this Court that includes, but is not limited to, an order enjoining Almay from continuing to engage in unlawful, unfair, or fraudulent business practices or any other act prohibited by law.

336. Plaintiff and the other members of the Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

337. The unfair and deceptive acts and practices of Almay, as described above, present a serious threat to Plaintiff and the other members of the Class.

WHEREFORE, Plaintiff pray for relief as set forth below.

## COUNT 4

## Violation of New York's General Business Law § 350

338.  Almay's acts constitute unlawful, deceptive, and fraudulent business acts and practices.

339.  Almay's misleading marketing, advertising, packaging, and labeling of the Falsely Labeled Products is false advertising likely to deceive a reasonable consumer.  Indeed, Plaintiff and the other Class members were deceived regarding the characteristics of Almay's Falsely Labeled Products, as Almay's marketing, advertising, packaging, and labeling of the Falsely Labeled Products misrepresents and/or omits the true nature, quality, and/or ingredients of the Falsely Labeled Products.

340.  There is no benefit to consumers or competition from deceptively marketing and labeling products.  Indeed, the harm to consumers and competition is substantial.

341.  Plaintiff and the other members of the Class who purchased the Falsely Labeled Products suffered a substantial injury as alleged herein.  Plaintiff and the other members of the Class who purchased the Falsely Labeled Products had no way of reasonably knowing that the Falsely Labeled Products they purchased were not as marketed, advertised, packaged, and labeled. Thus, they could not have reasonably avoided the injury each of them suffered.

342.  Almay has violated, and continues to violate, § 350 of the New York General Business Law, which makes false advertising unlawful.  As a direct and proximate result of Almay's violation of § 350, Plaintiff and other members of the Class have suffered damages in an amount to be determined at trial.  Had Plaintiff and the Class members known the true facts, they would not have purchased the products, would have purchased fewer products, or would not have been willing to pay the premium price Almay charged for the products.

343.  Pursuant to New York General Business Law § 350-e, Plaintiff seeks to recover

actual damages or $500, whichever is greater, and seeks to have these damages trebled.

344.     Pursuant to New York General Business Law § 350, Plaintiff also seeks an order of this Court that includes, but is not limited to, an order enjoining Almay from continuing to engage in false advertising or any other act prohibited by law.

345.     Plaintiff and the other members of the Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

346.     The unfair and deceptive acts and practices of Almay, as described above, present a serious threat to Plaintiff and the other members of the Class.

WHEREFORE, Plaintiff prays for relief as set forth below.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment on behalf of herself and the proposed Class, providing such relief as follows:

A.     Certification of the Class proposed herein under Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3); appointment of Plaintiff as Class representative; and appointment of her undersigned counsel as counsel for the Class;

B.     A declaration that Almay is financially responsible for notifying members of the Class of the pendency of this suit;

C.     An order requiring an accounting for, and imposition of a constructive trust upon, all monies received by Almay as a result of the unfair, misleading, fraudulent, and unlawful conduct alleged herein;

D.     Restitution, disgorgement, refund, and/or other monetary damages, together with costs and disbursements, including reasonable attorneys' fees pursuant to the applicable statutes and prejudgment interest at the maximum rate allowable by law;

E.    Injunctive relief on behalf of the Class, enjoining Almay's unlawful and deceptive acts;

F.    Statutory damages in the maximum amount provided by law;

G.    Punitive damages in accordance with proof and in an amount consistent with applicable precedent; and

H.    Such further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff and the Class members hereby demand a trial by jury.

DATED: August 3, 2018

_____

**THE GOLAN FIRM**
Yvette Golan
1712 N Street, NW, Suite 302
Washington, D.C. 20036
Tel: (866) 298-4150, ext. 101
Fax: (928) 441-8250

**FRANCIS & MAILMAN, P.C.**
James A. Francis (*pro hac vice* forthcoming)
David A. Searles (*pro hac vice* forthcoming)
Land Title Building, Suite 1902
100 South Broad Street
Philadelphia, PA 19110
Tel. (215) 735-8600
Fax. (215) 950-8000