UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KATHRYN FLINT, on behalf of herself and all others similarly situated,<br><br>       Plaintiff,<br><br>       v.<br><br>REVLON, INC., REVLON CONSUMER PRODUCTS CORP., and ALMAY, INC.,<br><br>       Defendants. | Case No. 1:18-cv-06992-NRB<br><br><br>AMENDED CLASS ACTION COMPLAINT<br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff Kathryn Flint, by her attorneys, brings this class action against Revlon, Inc., Revlon Consumer Products Corp., and Almay, Inc. (collectively, "Almay"), on her own behalf and on behalf of all others similarly situated, and alleges as follows:

## I.  SUMMARY

1. To capture the growing market of consumers seeking hypoallergenic products, Almay markets its products as "hypoallergenic." *See* Exhibit 1 (Almay Product Labels).

2. Almay defines what it means by "hypoallergenic."  *See* Exhibit 2 (Almay letter to Food and Drug Administration). Specifically, Almay defines a hypoallergenic product as one that does not contain ingredients that nations report to be sensitizers (*a.k.a.* allergens) or primary irritants. *Id.*

3. However, Almay's "hypoallergenic" representation is false under its own definition.  All the products cited in this lawsuit include ingredients that nations report to be sensitizers under international chemical classification standards.

1

4.      For example, in its definition, Almay lists salicylic acid[1] as a "known allergen" that would be unacceptable in hypoallergenic products. Exhibit 2. Nonetheless, Almay labels several of its salicylic-acid products as "hypoallergenic."  *See* Exhibit 1.

5.      Almay's definition comports with reasonable consumers' expectations and understanding of "hypoallergenic," as well as the FDA's approach to allergens in food products.

6.      To consider an analogy: peanuts are allergens, and a reasonable consumer would expect that a cereal containing peanuts would ***not*** be labeled as "hypoallergenic."  Under the Food Allergen Labeling and Consumer Protection Act of 2004, the FDA would also require the cereal label contain an allergen warning, 21 U.S.C. § 343(w), even if the ingredient is present in the product at insignificant levels.  21 U.S.C. § 343(w)(4) (requiring the allergen labeling even for "incidental additives"); 21 C.F.R. § 101.100(a)(3)(c) (defining "incidental additives" as, *inter alia*, "[s]ubstances that . . . are present in the finished food at insignificant levels . . . .").

7.      Not only are the ingredients in Almay's product sensitizers, but the entire product is also a sensitizer.  All of Almay's products contain such a high concentration of sensitizers that, under the international system of chemical classifications, Almay's finished product itself is also a sensitizer. *See* Exhibit 3 at 15 (GHS[2] Definitions) ("Skin sensitizer means a substance or mixture that will induce an allergic response following skin contact") *and* Exhibit 4, GHS Standards for

---

[1]      Classifying a substance as a sensitizer (allergen) does not mean that it is devoid of value in other products.  For example, peanuts are a rich source of protein, vitamins, and minerals, but they are nonetheless allergens. Peanuts can (and perhaps should) be included in a meal for the majority of people, but not for those who are allergic or who seek foods that do not contain allergens.
Similarly, salicylic acid is noted as an "essential medicine" by the World Health Organization, *see* http://apps.who.int/medicinedocs/en/d/Jh2918e/26.4.html. It is, however, an allergen that Almay ***itself*** deems unacceptable in hypoallergenic products.  *See* Exhibit 2.

[2]      "GHS" refers to the United Nation's Globally Harmonized System of Classification and Labeling of Chemicals, which is used internationally today.

2

Skin Sensitizers at § 3.4.3.3 (classifying a mixture as a sensitizer if the mixture contains sensitizers at concentrations of 0.1% or higher).

8.      The present case is unlike situations of unavoidable contamination, such as arsenic in rice.  According to the FDA, infant rice cereal contains an average of 103 ppb (parts per billion) of arsenic, or 0.000013%.  *See* Exhibit 5 (FDA's Analytical Results from Inorganic Arsenic in Rice Cereals for Infants, Non-rice Infant Cereal and Other Foods Commonly Eaten by Infants and Toddlers, Posted April 2016).

9.      In comparison, Almay's products contain *at least* 10,000 times more sensitizers (0.1%) than rice contains arsenic (0.000013%).

10.     Importantly, the amount of the sensitizers in Almay's products is sufficient to cause a skin allergy in a significant portion of the population. For a sensitized individual, only a single exposure to such a tiny amount of the chemical yields a full allergic response. In comparison, the ill health effects of arsenic occur only after "*long-term* exposure to *high levels* of arsenic." *See* FDA           Website,           Arsenic,           available           at https://www.fda.gov/Food/FoodborneIllnessContaminants/Metals/ucm280202.htm#FAQs    (last downloaded on December 24, 2018).

11.     Moreover, Almay purposefully added the sensitizers to its products.  In comparison, arsenic is not intentionally added to foods.  Instead, some plants contain arsenic because it naturally occurs    in    soil    and    water.    *See*    FDA    Website,    Arsenic,    available    at https://www.fda.gov/Food/FoodborneIllnessContaminants/Metals/ucm280202.htm#FAQs    (last downloaded on December 24, 2018).

12.     Thus, consumers have not received what they bargained for.  They were induced to purchase products they otherwise would not have purchased.

13.     Consumers have additionally paid a premium price for products they thought were hypoallergenic but are not.

## II.     INTRODUCTION

14.     Whether an annoying patch of dry skin or an oozing rash that affects one's social life, as much as 70% of the U.S. population is allergic to at least one personal care product ingredient. Most of these skin allergies are of unknown cause.

15.     While not impossible, it is extremely difficult for people to identify what ingredient they are allergic to. Allergic reactions are attenuated in both space and time. Some allergic reactions will not manifest until a week after exposure to the allergen.  Even worse – some allergic reactions will not manifest on the body part exposed to the allergen.  Instead, the immune system will sometimes "remember" the first exposure and the allergic reaction will develop on the body part that was *first* exposed to the allergen.

16.     Thus, consumers increasingly seek hypoallergenic products.  Those who do not suffer from skin allergies seek hypoallergenic products to avoid developing a skin allergy.  Those who do suffer from a skin allergy seek hypoallergenic products to avoid the inflammatory cascade caused by an unidentified skin allergen.

17.     Seeking to capture the growing hypoallergenic market, Almay prominently labels many of its products as "hypoallergenic."  *See* Exhibit 1 (Product Labels).

18.     This representation is false. Almay's products in fact contain a shocking array and substantial amount of known skin sensitizers (allergens), agents that cause severe skin corrosion, serious eye damage, skin irritants, eye irritants, or are otherwise toxic or hazardous in the case of skin contact. *See* Exhibit 1; Ingredient Table at ¶ 107, *infra.*

19.     Almay defines what it means by the term "hypoallergenic:"

> In order for the word "hypo-allergenic" to be used in the labelling of a cosmetic product, said product shall have been formulated and manufactured in accordance with the following standards:
> 1.   Care shall have been exercised in the selection of the ingredients, and of the suppliers thereof, such that the product shall contain none of the following ingredients which are generally recognized and reported by competent authorities to be primary irritants or sensitizers …

Exhibit 2 (June 22, 1973 letter to FDA on behalf of Almay).

20.     Along with its definition, Almay lists dozens of ingredients it recognizes as "known allergens" that would be unacceptable in hypoallergenic products.  Exhibit 2.

21.     Among others, Almay lists corn starch, salicylic acid, and zinc stearate as known allergens.  Exhibit 2.  Almay's products contain these ingredients, yet Almay nonetheless labels the products as "hypoallergenic."  Exhibit 1.

22.     Many of the ingredients are permitted in cosmetics and body care products.  Yet Almay did not simply claim that its products are "legal." It made the *additional* claim that its products are "hypoallergenic" when they are not.

23.     By deceiving consumers about the nature, quality, and/or ingredients of its products, Almay is able to command a premium price, increasing consumers' willingness to pay and take away market share from competing products, thereby increasing its own sales and profits.

24.     Consumers lack the ability to test or independently ascertain the toxicity of a chemical, especially at the point of sale.  Reasonable consumers must and do rely on the chemicals company to honestly report the nature of the product's ingredients.

25.     Almay further encouraged consumers to rely on its representations, marketing itself as an honest company that provides transparent and truthful information about its products' ingredients.

26.     Almay intended for consumers to rely on its representations, and hundreds of

thousands of reasonable consumers did in fact so rely.

27.     As a result of its false and misleading labeling, Almay was able to sell these products to hundreds of thousands of consumers throughout the United States and to profit handsomely from these transactions.

28.     Almay's false and misleading representations and omissions violate state and federal law, both civil and criminal, detailed more fully below, including New York statutes, and common law.

29.     Plaintiff brings this action to stop Almay's deceptive and misleading practices.

### III.     JURISDICTION AND VENUE

30.     This Court has personal jurisdiction over the parties in this case.

31.     Plaintiff is a citizen of California.

32.     This Court has personal jurisdiction over each Defendant because they are all corporations with their principal place of business within the State of New York, at One New York Plaza, New York, NY 10004.

33.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).  Jurisdiction under CAFA is met because the proposed number of putative class members exceeds 100, at least one plaintiff and one defendant are citizens of different states, and the amount in controversy, including, but not limited to the aggregate amount of relief sought by absent class members, exclusive of interest and costs, exceeds $5 million.

34.     Venue is proper in this District under 28 U.S.C. § 1391(b) because all Defendants reside in this District.

35.     No other forum would be more convenient for the parties and witnesses to litigate this action.

## IV.    PARTIES

36.    Plaintiff Kathryn Flint is an individual consumer who, at all times material hereto, was a citizen of the State of California.  During the class period, Plaintiff Flint occasionally purchased several of the Falsely Labeled Products at retail prices. For example, Ms. Flint occasionally purchased Almay's Truly Lasting Color Liquid Makeup, Almay's Clear Complexion Concealer, and Almay's Color + Care Liquid Lip Balm at the Walgreens located at 1189 Potrero Avenue, San Francisco, CA 94110.

37.    In deciding to make these purchases, Plaintiff Flint saw, relied upon, and reasonably believed the label representation that the products were "hypoallergenic." These representations were a significant reason for her purchases.

38.    Plaintiff Flint and her family members have all suffered skin irritation, eye irritation, dermatitis, and/or an allergic skin reaction in the past.

39.    Like similarly situated consumers, Plaintiff Flint does not know the identity of every ingredient she and her family are allergic to.  Moreover, like similarly situated consumers, Plaintiff Flint does not know which ingredients she or her family may develop an allergy to.

40.    Had Plaintiff Flint known at the time that these products were not hypoallergenic as promised, she would not have purchased these products.

41.    Had Plaintiff Flint known at the time that these products contained irritating, toxic, hazardous, or otherwise harmful chemicals, she would not have purchased these products.

42.    Plaintiff Flint purchased, purchased more of, or paid more for, these products than she would have had she known that the products contained skin sensitizers, irritants, toxins, carcinogens, or otherwise harmful chemicals.

43.    If Almay's products were reformulated such that its representations were truthful,

Plaintiff Flint would purchase Almay's products in the future. Plaintiff Flint regularly visits stores where Almay's products are sold, and continually sees Almay's packaging but has no way of determining the truth of the representation that the products are hypoallergenic.

44. The products that Plaintiff Flint purchased are substantially similar to Almay's other products alleged to be falsely labeled.

45. Defendant Revlon, Inc. is a corporation with its principal place of business located at One New York Plaza, New York, New York. Doing business under its brand "Almay," Revlon, Inc. manufactures and/or causes the manufacture of cosmetics and personal care products. Revlon, Inc. labels these products under its "Almay" brand name and markets and distributes the products in retail and online stores located throughout the United States.

46. Defendant Revlon Consumer Products Corp. is a corporation with its principal place of business located at One New York Plaza, New York, New York. Doing business under its brand "Almay," Revlon Consumer Products Corp. manufactures and/or causes the manufacture of cosmetics and personal care products. Revlon Consumer Products Corp. labels these products under its "Almay" brand name and markets and distributes the products in retail and online stores located throughout the United States.

47. Defendant Almay, Inc. is a corporation with its principal place of business located at One New York Plaza, New York, New York. Almay, Inc. manufactures and/or causes the manufacture of cosmetics and personal care products. Almay, Inc. labels these products under its "Almay" brand name and markets and distributes the products in retail and online stores located throughout the United States.

48. Defendants Revlon Inc. and Almay Inc. engaged in false and deceptive advertising in the state of New York. They labeled the products as "hypoallergenic" in New York and selected

8

the deceptive marketing language in New York.

## V.    FACTUAL ALLEGATIONS

### A.    Consumers Actively Seek Hypoallergenic Cosmetics And Body Care Products

49.    According to the Centers for Disease Control and Prevention ("CDC"), 8.8 million children (12% of U.S. children) reported skin allergies in 2012. Skin allergies are even more prevalent among young children; CDC reports that 14.2% of children between the ages of 0 and 4 suffered a skin allergy in 2012.

50.    These numbers are likely to underreport the prevalence of allergic contact dermatitis; recent studies show that somewhere between 14-70% of children suffer from skin allergies, based on positive patch skin tests.

51.    Skin allergies are similarly prevalent among adults.

52.    When skin is exposed to a sufficient amount of a chemical allergen, the skin is "sensitized." Upon re-exposure to the allergen, the skin initiates an inflammatory cascade, causing skin changes associated with allergic contact dermatitis. These include redness, oedema (fluid retention), scaling, fissures (cracking), vesicles (fluid-filled sacs), bullae (bubble-like cavity), and eventually oozing.

53.    Contact sensitization and related skin allergies can severely affect a person's quality of life, depending on the severity and the site of skin sensitization. People suffering from noticeable skin allergies will try to hide the symptoms under clothing if possible, and if not, will avoid public spaces entirely. In either case, skin allergies can dramatically affect a person's confidence and engagement in life.

54.    It is difficult to identify the substance causing an allergic response. Allergic contact dermatitis develops several days after exposure to a skin allergen. Some substances do not cause

9

symptoms until a week after exposure.

55.     Even more, once an individual is sensitized to an allergen, future contact with the allergen can trigger a response in the *original* site of sensitization. For example, if someone had an allergic response to a product used on the face, and later used a different product containing the same allergen on the legs, the allergic response will occur again on the *face* – even if the face was never exposed to the second product.

56.     When a consumer cannot identify the material to which they are allergic, allergic contact dermatitis will persist, and, it is believed, will take longer to resolve even after the cause is identified.

57.      Thus, consumers will actively seek out hypoallergenic products – to avoid a skin allergy from occurring at all and/or to prevent a known skin allergy from repeating the inflammatory cascade.

**B.     Almay Bases Its Brand On Its Hypoallergenic Representations**

58.     Almay bases its brand on its promise of providing hypoallergenic products.

59.     In fact, Almay claims that it was formed for the purpose of providing hypoallergenic products:

How we made history

Almay has been changing the name of the game since 1931. In a world of heavy, high fragranced, irritating products, Almay chemist and founder Alfred Woititz embarked on a beauty line that defied the times.

His inspiration? His wife. Fanny May had sensitive skin, a delicate complexion and lots of opinions. Together, they worked to create products that would help all women look and feel their best. With the help of Dermatologist Dr. Marion Sulzberger, the duo created the first hypoallergenic, fragrance-free cosmetic line.

10

They coined it Almay, a perfect combination of Al+May.

Part science. Part self-expression. Almay has always led the way.

Exhibit 6 (Almay – How We Feel About Makeup.pdf). *See also* Exhibit 7 (Almay History.pdf).

60.     Almay repeats its "hypoallergenic" representation like a mantra, emblazoning the term on its advertisements, product displays, and product labels. *See* Exhibit 1; Exhibit 8 (magazine advertisements).

## C.     Almay's Definition of "Hypoallergenic"

61.     When the FDA considered establishing a regulatory definition of the term "hypoallergenic," Almay provided the FDA with the following definition, describing it as "its view on the meaning and use of the word 'hypo-allergenic.'"

> In order for the word "hypo-allergenic" to be used in the labelling of a cosmetic product, said product shall have been formulated and manufactured in accordance with the following standards:
> 1.  Care shall have been exercised in the selection of the ingredients, and of the suppliers thereof, such that **the product shall contain none** of the following ingredients which are generally recognized and reported by competent authorities to be primary irritants or sensitizers …

Exhibit 2 (emphasis added).

62.     In other words, according to Almay, a hypoallergenic product contains **no** ingredients reported by competent authorities as a sensitizer.  *See* Exhibit 2.

63.     As detailed more fully below, a "competent authority" is a body authorized by each country to classify a substance according to the international system of chemicals classification.

64.     As detailed more fully below, a sensitizer is a substance that causes an allergic response even in **extremely** small amounts, *e.g.,* $\leq 0.1\%$ intradermal induction dose causes a positive response in more than 30% of guinea pigs in a guinea pig maximization test.

65.     As detailed more fully below, competent authorities report a chemical is a sensitizer

11

based on international chemical classification standards. Those standards are substantially the same now as they were at the time of Almay's letter in 1973.

66.    As detailed more fully below, *all* of Almay's products contain ingredients that competent authorities report as a sensitizer.

67.    As Almay explained to the FDA, its "no known allergens" definition is pivotal to its product line:

> The origin of the line was based on identifying all known allergens and then formulating products eliminating these ingredients. Extreme care in selection of ingredients was essential in the formulation of the products and this diligence has been perpetuated to the current time. Over the years this list of all allergens has expanded.

Exhibit 2.  *See also* Exhibits 6, 7.

68.    Even today, Almay's "no known allergens" definition remains pivotal to its product line.

69.    For example, Almay knows that consumers rely upon it to not only test the final product formulation for basic safety, but to select only those ingredients that it considers to be safe. Almay continues to represent to consumers that it examines each individual ingredient. As Almay explains to consumers today:

> Stringent Standards of Quality Control
>
> Almay is so stringent that fewer than 500 of the over 10,000 ingredients available for use in cosmetics meet almay's superior standards. Raw materials and finished products are closely monitored for quality and purity. All new ingredients are carefully screened for their potential for sensitization and toxicity.

Exhibit 7; *see also* Exhibits 2, 6.  However, many ingredients in Almay's products have not been adequately studied for sensitization and toxicity. *See* Exhibit 9 (Additional Ingredient Detail).

70.    Almay emphasized to the FDA how "[c]onsiderable thought and effort has been expended in the devising of various criteria delineating such cosmetic products as might be

12

properly labeled 'hypo-allergenic.'"  Exhibit 2.

71.    Almay's definition reflects the reality of allergens: even a tiny amount in a product will cause a full allergic response.

72.    For example, a cereal containing even *trace* amounts of peanuts will cause an allergic response in individuals who are allergic – an estimated 0.76% of the U.S. population.



0.76% of the U.S. population is allergic to peanuts, according to the 2010 National Health and Nutrition Examination Surveyconducted by the National Center for Health Statistics of the Centers for Disease Control, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3822433/bin/NIHMS522021-supplement-supplement_1.pdf.

73.    Similarly, a product mixture (such as a lotion, a foundation, etc.) will cause a full-fledged allergic response in individuals who are allergic if it contains even a *tiny* amount (*e.g.*, 0.1%) of a sensitizer.



According to independent tests, a solution with 0.1% of quaternium-15 leads to an allergic response in 30% of test animals.

74.    Thus, just as the FDA requires food to contain an allergen warning even if the food contains an insignificant amount of a common allergen (such as peanuts), 21 U.S.C. § 343(w)(4) (requiring the allergen labeling even for "incidental additives"); 21 C.F.R. § 101.100(a)(3)(c)

(defining "incidental additives" as, *inter alia*, "[s]ubstances that . . . are present in the finished food at insignificant levels . . . ."), Almay requires products containing any nationally reported sensitizers or primary irritants to *not* be labeled "hypoallergenic."  Exhibit 2.

75.     Almay's definition also comports with reasonable consumers' expectations. As Almay explained to the FDA: "Members of the medical profession and consumers alike recognize the category of hypo-allergenic cosmetics and understand the term hypo-allergenic as what Almay represents it to mean."  Exhibit 2.

76.     Once skin is sensitized, even a *minute* amount of the chemical allergen is enough to cause a full-blown allergic response. Thus, consumers seeking hypoallergenic products reasonably expect that the product does not contain *any* skin sensitizers, just as consumers would not expect that a peanut-containing product be labeled as "allergen-free."

77.     Thus, as Almay and reasonable consumers agree, a hypoallergenic product is one that does not contain ingredients which are "generally recognized and reported by competent authorities to be primary irritants or sensitizers."  Exhibit 2.

### 1.     "Competent Authority"

78.     As Almay observes in its definition, ingredients are "reported by competent authorities to be primary irritants or sensitizers."  Exhibit 2 at 4.

79.     "*Competent authorities*" means the bodies designated by each country as authorized to classify chemicals. *See, e.g.,* Exhibit 3, GHS Definitions, 7th ed. at 11.

80.     Both in 1973 and today, competent authorities report chemicals as sensitizers or irritants based on internationally accepted standards.

81.     At the time of Almay's FDA letter, the United States was a member of the Organisation for Economic Co-operation and Development ("OECD").  The OECD's Chemicals

Programme began a harmonized system for countries to share chemical information. *See* OECD/LEGAL/0441, available at https://legalinstruments.oecd.org/en/instruments/OECD-LEGAL-0441.OECD.

82.     OECD helped develop, and then adopted the United Nation's Globally Harmonized System of Classification and Labeling of Chemicals ("GHS"). GHS provides globally uniform physical, environmental, and health and safety information on hazardous chemical substances and mixtures. It establishes criteria for the classification of the physical, health, and environmental hazards of chemical substances and mixtures and standardized hazard information to facilitate global trade of chemicals.

83.     Because of the vast number of chemicals that must be analyzed, many chemicals have not been assessed by governmental authorities.  Other reputable, independent organizations are also regarded as providing reliable and accurate assessments of the sensitization characteristics of chemicals, such as the American Contact Dermatitis Society's Core Allergen Series.

84.     The standards and tests used to classify a chemical as a sensitizer or irritant are substantially the same today under GHS as they were in 1973.

85.     For example, both in 1973 and today, competent authorities test a substance's sensitization potential by using the Buehler test (introduced in 1965), the guinea pig maximization test (introduced in 1969), and the human repeat insult patch test (originating from a test described in 1944). In fact, the current federal regulations on skin sensitization testing state that eight references should be consulted for "additional background information on this test guideline," *see* Exhibit 10, 40 C.F.R. § 798.4100(f), all of which were published before or shortly after Almay's letter to the FDA. *Id.* (citing four studies published 1973 or earlier, two published in 1975, and two published in 1977).

86.    Then, as now, ingredient sourcing and manufacturing processes do not bear upon the definition of a sensitizer or hypoallergenic.  Improved ingredient sourcing and manufacturing processes may alter a chemical such that the sensitization tests yield different results, *e.g.,* by adding or removing certain contaminants.  However, the definition of "sensitizer" has not changed — instead, the ingredient being tested has changed.

87.    Thus, Almay's definition of hypoallergenic means the same today as it meant in 1973; a product cannot be labeled as "hypoallergenic" if it contains a chemical that an authorized national body reports as a sensitizer.

### 2.    Sensitizer

88.    Under the international classification system for chemicals, a "***sensitizer***" (*a.k.a.* "Category 1 skin sensitizer") is a chemical that causes an allergic response to a defined percentage of the population at a defined and extremely low concentration, *e.g.,* $\leq 0.1\%$ intradermal induction dose causes an allergic reaction in more than 30% of guinea pigs in a guinea pig maximization test. *See* Exhibit 4, GHS Standards for Skin Sensitizers at §§ 3.4.2.2.1.1, *et seq.  See also* Exhibit 11, 29 C.F.R. § 1910.1200 Appendix A.4.2.2.

89.    That is, a chemical that is classified as a sensitizer will cause an allergic response in a significant portion of the population – even at *very low concentrations* (*e.g.*, 0.1% or similar).

90.    If a product contains sensitizers – even at very low concentrations (*e.g.*, 0.1% or similar) – testing has already confirmed that it will cause an allergic response to a sufficiently large percentage of the population. Whether the skin sensitizer is diluted with Almay's makeup or a laboratory's aqueous solution, testing has shown that the product will cause an allergic response to a sufficiently large percentage of the population.

**D.**    **Alternative Definition of "Hypoallergenic"**

91.    In the alternative, reasonable consumers believe that a product labeled as "hypoallergenic" does not contain sensitizers in an amount that can reasonably be expected to induce an allergic response in a significant number of people.

92.    According to GHS, the international chemicals classification system in use today, when a product contains sensitizers at concentrations of 0.1% or higher, the *entire* product is a sensitizer.  *See* Exhibit 4, GHS Standards for Skin Sensitizers § 3.4.3.3.  *See also* Exhibit 11, 29 C.F.R. § 1910.1200 Appendix A.4.2.2.

93.    Each Almay product is itself a sensitizer, as each Almay product is made up of 0.1% or more of skin sensitizers.

94.    In some cases, skin sensitizers make up *much more* than 0.1% of the Almay product. For example, some Almay products contain 5% oxybenzone, a chemical that competent authorities report to be a sensitizer.

95.    Thus, each Almay product will cause a skin allergy in a significant portion of the population. *See* definition of sensitizer, at Exhibit 3, GHS Definitions at 15, and Exhibit 4, GHS Standards for Skin Sensitizers at § 3.4.3.3 (classification of mixtures as sensitizers).

96.    While 0.1% may seem like a small amount, this small amount is enough to cause an allergic reaction.  When the chemical was tested for sensitization potential, it was tested at this same concentration — 0.1% or similar — not at 100% concentration.

97.    By analogy, a notable percentage of the population (0.76%) suffers from peanut allergies. In these allergic individuals, even "trace amounts of peanut, **smaller than a grain of sand**, can cause a severe life-threatening reaction." *See* Talking Peanut Allergy Website, https://www.talkingpeanutallergy.com, last visited December 25, 2018 (emphasis in original).

17

E.       **Almay's False Representations**

98.      On the products' labels, and again on its retail website, Almay represents that certain of its products are "hypoallergenic."

99.      The only way to ascertain whether a product satisfies Almay's definition of "hypoallergenic" is to identify which ingredients are in Almay's products and to ascertain if these ingredients are reported by competent authorities as a sensitizer.

100.     None of Almay's products (collectively, the "Falsely Labeled Products") are "hypoallergenic" under Almay's own definition because all contain ingredients that are reported by competent authorities as a sensitizer. *See* Ingredient Table, *infra* at ¶ 107 (identifying chemicals classified by competent authorities as sensitizers) and Exhibit 1 (showing which products contain these sensitizers).

101.     Additionally, none of Almay's products are "hypoallergenic" under the alternative definition because they all contain sensitizers at concentrations higher than 0.1%, or at concentrations that may elicit an allergic response at concentrations lower than 0.1% in sensitized individuals.  *See* Ingredient Table, *infra* at ¶ 107 (identifying chemicals classified by competent authorities and other reputable sources as sensitizers) and Exhibit 1 (showing which products contain these sensitizers).

102.     Almay's on-the-label promise that its products are "hypoallergenic" is therefore false and misleading, under both Almay's definition and the alternative definition.

103.     These products are:

    intense i-color eyeliner
    intense i-color liquid eyeliner
    intense i-color liquid shadow + color primer
    one coat thickening waterproof mascara
    intense i-color volumizing mascara
    one coat lengthening mascara

one coat thickening mascara
one coat get up & grow mascara
smart shade concealer
smart shade smart balancing pressed powder
oil free makeup eraser sticks
truly lasting color liquid makeup
smart shade perfect & correct primer
longwear & waterproof eye makeup remover pads
longwear & waterproof gentle eye makeup remover
oil free gentle eye makeup remover pads
liquid eyeliner
eyeliner [aka "eyeliner pencil"]
intense i-color gel smooth liner
intense i-color evening smoky
intense i-color everyday neutrals
intense i-color party brights
one coat multi-benefit mascara
one coat get up & grow waterproof mascara
smart shade cc cream complexion corrector
clear complexion concealer
clear complexion pressed powder
smart shade anti-aging skin tone matching makeup
smart shade skintone matching makeup
oil free gentle eye makeup remover
oil free makeup remover towelettes
clear complexion makeup remover
brow defining pencil

age essentials lip treatment
the complete look makeup palette
pen eyeliner
intense i-color defining liner
age essentials concealer
age essentials makeup
healthy glow makeup + gradual self tan

104.    The labels of these products are attached as Exhibit 1.

105.    Further encouraging consumers' reliance on Almay's "hypoallergenic" promise, Almay labels only *some* products as hypoallergenic, giving consumers the (false) impression that Almay carefully reviewed each ingredient in its products to ensure that the "hypoallergenic" promise was made for only those products that truly are hypoallergenic. *See, e.g.,* Exhibit 12.

19

106.    Yet, contrary to Almay's promise, *all* these products in fact contain chemicals that competent authorities have reported to be sensitizers under international standards. *See* Ingredient Table, *infra* at ¶ 107 (column 1). Many contain chemicals that Almay itself lists as a primary irritant or sensitizer that is unacceptable in hypoallergenic products. *Id.* (column 2). All also contain chemicals reported by competent authorities as skin or eye irritants. *Id.* (column 3). Many also contain chemicals reported by other reputable organizations to be sensitizers. *Id.* (column 4).

107.    Additional details about these and other ingredients in Almay's products is provided in Exhibit 9.

| | Competent Authorities - Sensitizer | Almay's List of Unacceptable Ingredients | Competent Authorities - Irritant | Other Reputable Authorities - Sensitizer |
|---|---|---|---|---|
| Acrylonitrile | reported by the ECHA as a skin sensitizer; reported by Japan as a skin sensitizer; reported by Australia as a skin sensitizer; reported by New Zealand as a skin sensitizer; | | reported by the ECHA as causing Category 1 eye damage; reported by Japan as causing Category 1 eye damage; reported by Australia as causing Category 1 eye damage; reported by the ECHA as a skin irritant; reported by Japan as a skin irritant; reported by the New Zealand as a skin irritant; reported by Japan as an eye irritant; reported by New Zealand as an eye irritant; | |
| Quaternium-15 | reported by the ECHA as a skin sensitizer; reported by Australia as a skin sensitizer; | | reported by the ECHA as a skin irritant; | American Contact Dermatitis Society Core Allergen Series; |
| Acacia Senegal Gum | reported by New Zealand as a skin sensitizer; | in Almay's list of ingredients deemed unacceptable in hypoallergenic products | | |

| | Competent Authorities - Sensitizer[1] | Almay's List of Unacceptable Ingredients | Competent Authorities[1] - Irritant | Other Reputable Authorities - Sensitizer |
|---|---|---|---|---|
| Benzyl Alcohol | reported by New Zealand as a skin sensitizer; | | reported by Japan as a skin irritant; reported by Japan as an eye irritant; reported by New Zealand as an eye irritant; | American Contact Dermatitis Society Core Allergen Series; listed by the EU as a fragrance chemical which, according to existing knowledge, is most frequently reported and well-recognised consumer allergens |
| Sorbic Acid | reported by New Zealand as a skin sensitizer; | | reported by the New Zealand as a skin irritant; reported by New Zealand as an eye irritant; | American Contact Dermatitis Society Core Allergen Series; |
| Phytantriol | reported by New Zealand as a skin sensitizer; | | reported by the New Zealand as a skin irritant; | |
| Sodium Laureth-12 Sulfate | reported by New Zealand as a skin sensitizer; | | reported by New Zealand as causing Category 1 eye damage; reported by Japan as a skin irritant; reported by the New Zealand as a skin irritant; reported by Japan as an eye irritant; reported by New Zealand as an eye irritant; | |
| Ethylparaben | reported by New Zealand as a skin sensitizer; | | reported by New Zealand as an eye irritant; | |
| Niacinamide | reported by New Zealand as a skin sensitizer; | | reported by New Zealand as an eye irritant; | |
| Propylparaben | reported by New Zealand as a skin sensitizer; | | reported by New Zealand as an eye irritant; | |
| Methylparaben | reported by New Zealand as a skin sensitizer; | | reported by Japan as a skin irritant; reported by Japan as an eye irritant; reported by New Zealand as an eye irritant; | |
| BHT | reported by Japan as a skin sensitizer; reported by New Zealand as a skin sensitizer; | | reported by Japan as a skin irritant; reported by Japan as an eye irritant; | American Contact Dermatitis Society Core Allergen Series; |

21

| | Competent Authorities - Sensitizer[1] | Almay's List of Unacceptable Ingredients | Competent Authorities - Irritant | Other Reputable Authorities - Sensitizer |
|---|---|---|---|---|
| Salicylic Acid | reported by Japan as a skin sensitizer; | in Almay's list of ingredients deemed unacceptable in hypoallergenic products | reported by Australia as causing Category 1 eye damage; reported by Japan as a skin irritant; reported by the New Zealand as a skin irritant; reported by Japan as an eye irritant; reported by New Zealand as an eye irritant; | |
| Oxybenzone | reported by Japan as a skin sensitizer; | | reported by Japan as a skin irritant; reported by Japan as an eye irritant; | American Contact Dermatitis Society Core Allergen Series; |
| Triethanolamine | reported by Japan as a skin sensitizer; | | reported by Japan as a skin irritant; reported by Japan as an eye irritant; reported by New Zealand as an eye irritant; | |
| Chromium hydroxide green (CI 77289) | reported by Japan as a skin sensitizer; | | reported by Japan as a skin irritant; reported by Japan as an eye irritant; | |
| Chromium oxide greens (CI 77288) | reported by Japan as a skin sensitizer; | | reported by Japan as a skin irritant; reported by Japan as an eye irritant; | |
| Diazolidinyl Urea | reported by Australia as skin sensitizer; reported by New Zealand as a skin sensitizer; | | | American Contact Dermatitis Society Core Allergen Series; |
| Imidazolidinyl Urea | reported by Australia as skin sensitizer; | | reported by New Zealand as an eye irritant; | American Contact Dermatitis Society Core Allergen Series; |
| Zinc Stearate | | in Almay's list of ingredients deemed unacceptable in hypoallergenic products | reported by Japan as a skin irritant; reported by Japan as an eye irritant; | |
| Lanolin | | in Almay's list of ingredients deemed unacceptable in hypoallergenic products | | |
| Zea Mays (Corn) Starch | | in Almay's list of ingredients deemed unacceptable in hypoallergenic products | | |

22

| | Competent Authorities - Sensitizer[1] | Almay's List of Unacceptable Ingredients | Competent Authorities [1]- Irritant | Other Reputable Authorities - Sensitizer |
|---|---|---|---|---|
| Phenoxyethanol | | | reported by Japan as a skin irritant; reported by the ECHA as an eye irritant; reported by Japan as an eye irritant; reported by New Zealand as an eye irritant; | American Contact Dermatitis Society Core Allergen Series; |
| Benzophenone-4 | | | | American Contact Dermatitis Society Core Allergen Series; |
| Cetearyl Alcohol | | | | American Contact Dermatitis Society Core Allergen Series; |
| Octinoxate | | | | American Contact Dermatitis Society Core Allergen Series; |
| Propylene Glycol | | | | American Contact Dermatitis Society Core Allergen Series; |
| Sorbitan Sesquioleate | | | | American Contact Dermatitis Society Core Allergen Series; |
| Tocopherol | | | | American Contact Dermatitis Society Core Allergen Series; |
| Aminoethyl propanediol | | | reported by the New Zealand as a skin irritant; reported by New Zealand as an eye irritant; | |
| Oleic Acid | | | reported by the New Zealand as a skin irritant; reported by New Zealand as an eye irritant; | |
| Sorbitan Trioleate | | | reported by the New Zealand as a skin irritant; reported by New Zealand as an eye irritant; | |
| Tromethamine | | | reported by the New Zealand as a skin irritant; reported by New Zealand as an eye irritant; | |

23

| | Competent Authorities - Sensitizer[1] | Almay's List of Unacceptable Ingredients | Competent Authorities [1] - Irritant | Other Reputable Authorities - Sensitizer |
|---|---|---|---|---|
| Octisalate | | | reported by the New Zealand as a skin irritant; | |
| Triethoxycaprylylsilane | | | reported by the New Zealand as a skin irritant; | |
| Isopropanolamine | | | reported by the ECHA as causing Category 1 skin corrosion; reported by Japan as causing Category 1 skin corrosion; reported by Australia as Causing Category 1 skin corrosion; reported by New Zealand as causing Category 1 skin corrosion; reported by Japan as causing Category 1 eye damage; reported by New Zealand as causing Category 1 eye damage; reported by Japan as a skin irritant; reported by Japan as an eye irritant; | |
| Sodium Hydroxide | | | reported by the ECHA as causing Category 1 skin corrosion; reported by Japan as causing Category 1 skin corrosion; reported by Australia as causing Category 1 skin corrosion; reported by New Zealand as causing Category 1 skin corrosion; reported by Japan as causing Category 1 eye damage; reported by New Zealand as causing Category 1 eye damage; reported by Japan as a skin irritant; reported by Japan as an eye irritant; | |

24

| | Competent Authorities - Sensitizer[1] | Almay's List of Unacceptable Ingredients | Competent Authorities [1] - Irritant | Other Reputable Authorities - Sensitizer |
|---|---|---|---|---|
| **Ammonium Hydroxide** | | | reported by the ECHA as causing Category 1 skin corrosion; reported by Japan as causing Category 1 skin corrosion; reported by Australia as a Skin corrosion – category 1; reported by Japan as causing Category 1 eye damage; reported by Japan as a skin irritant; reported by Japan as an eye irritant; | |
| **Benzoic Acid** | | | reported by the ECHA as causing Category 1 eye damage; reported by Japan as causing Category 1 eye damage; reported by Australia as causing Category 1 eye damage; reported by the ECHA as a skin irritant; reported by Japan as a skin irritant; reported by Japan as an eye irritant; reported by New Zealand as an eye irritant; | |
| **Tetrasodium EDTA** | | | reported by the ECHA as causing Category 1 eye damage; reported by Australia as causing Category 1 eye damage; reported by Japan as a skin irritant; reported by Japan as an eye irritant; reported by New Zealand as an eye irritant; | |
| **Ethylhexylglycerin** | | | reported by the ECHA as causing Category 1 eye damage; reported by Australia as causing Category 1 eye damage; | |
| **Linoleic Acid** | | | reported by the ECHA as causing Category 1 eye damage; | |
| **Potassium Sorbate** | | | reported by the ECHA as an eye irritant;  reported by New Zealand as an eye irritant; | |

| | Competent Authorities - Sensitizer[1] | Almay's List of Unacceptable Ingredients | Competent Authorities [1] - Irritant | Other Reputable Authorities - Sensitizer |
|---|---|---|---|---|
| Hexylene Glycol | | | reported by the ECHA as a skin irritant; reported by Japan as a skin irritant; reported by the New Zealand as a skin irritant; reported by the ECHA as an eye irritant; reported by Japan as an eye irritant;  reported by New Zealand as an eye irritant; | |
| Ceteareth-6, -12, and -20 | | | reported by New Zealand as causing Category 1 eye damage; reported by the New Zealand as a skin irritant; | |
| Citric Acid | | | reported by New Zealand as causing Category 1 eye damage; | |
| Blue 1 Lake (CI 42090) | | | reported by New Zealand as an eye irritant; | |
| Cetyl Alcohol | | | reported by New Zealand as an eye irritant; | |
| Dimethicone | | | reported by New Zealand as an eye irritant; | |
| Dimethiconol | | | reported by New Zealand as an eye irritant; | |
| Dipropylene Glycol | | | reported by New Zealand as an eye irritant; | |
| Disodium EDTA | | | reported by New Zealand as an eye irritant; | |
| Disodium Phosphate | | | reported by New Zealand as an eye irritant; | |
| Hectorite | | | reported by New Zealand as an eye irritant; | |
| Panthenol | | | reported by New Zealand as an eye irritant; | |
| Pentylene Glycol | | | reported by New Zealand as an eye irritant; | |
| Simethicone | | | reported by New Zealand as an eye irritant; | |
| Sodium Citrate | | | reported by New Zealand as an eye irritant; | |
| Sodium Phosphate | | | reported by New Zealand as an eye irritant; | |
| Sodium Xylene Sulfonate | | | reported by New Zealand as an eye irritant; | |
| Stearyl Alcohol | | | reported by New Zealand as an eye irritant; | |
| Tin Oxide (CI 77861) | | | reported by New Zealand as an eye irritant; | |
| Trisodium EDTA | | | reported by New Zealand as an eye irritant; | |

| | Competent Authorities - Sensitizer[1] | Almay's List of Unacceptable Ingredients | Competent Authorities [1] - Irritant | Other Reputable Authorities - Sensitizer |
|---|---|---|---|---|
| Urea | | | reported by New Zealand as an eye irritant; | |
| Iron Oxides (CI 77491) | | | reported by Japan as causing Category 1 eye damage; reported by Japan as a skin irritant; reported by Japan as an eye irritant; | |
| Menthol | | | reported by Japan as a skin irritant; reported by the New Zealand as a skin irritant; reported by Japan as an eye irritant; reported by New Zealand as an eye irritant; | |
| Oligopeptide-24 | | | reported by Japan as a skin irritant; reported by the New Zealand as a skin irritant; reported by Japan as an eye irritant; reported by New Zealand as an eye irritant; | |
| Isopropyl Alcohol | | | reported by Japan as a skin irritant; reported by the ECHA as an eye irritant; reported by Japan as an eye irritant; reported by New Zealand as an eye irritant; | |
| EDTA | | | reported by Japan as a skin irritant; reported by the ECHA as an eye irritant; reported by Japan as an eye irritant; reported by New Zealand as an eye irritant; | |
| Propylene Carbonate | | | reported by Japan as a skin irritant; reported by the ECHA as an eye irritant; reported by Japan as an eye irritant; reported by New Zealand as an eye irritant; | |
| Black 2 (CI 77266) | | | reported by Japan as a skin irritant; reported by Japan as an eye irritant; reported by New Zealand as an eye irritant; | |
| Alumina | | | reported by Japan as a skin irritant; reported by Japan as an eye irritant; | |
| Aluminum Powder (CI 77000) | | | reported by Japan as a skin irritant; reported by Japan as an eye irritant; | |

| | Competent Authorities - Sensitizer[1] | Almay's List of Unacceptable Ingredients | Competent Authorities[1] - Irritant | Other Reputable Authorities - Sensitizer |
|---|---|---|---|---|
| C13-14 Isoparaffin | | | reported by Japan as a skin irritant; reported by Japan as an eye irritant; | |
| Cyclopentasiloxane | | | reported by Japan as a skin irritant; reported by Japan as an eye irritant; | |
| Dibutyl Adipate | | | reported by Japan as a skin irritant; reported by Japan as an eye irritant; | |
| Magnesium Stearate | | | reported by Japan as a skin irritant; reported by Japan as an eye irritant; | |
| Paraffin, a.k.a. Synthetic Wax | | | reported by Japan as a skin irritant; reported by Japan as an eye irritant; | |
| Paraffinum Liquidum ((mineral oil) huile minerale) | | | reported by Japan as a skin irritant; reported by Japan as an eye irritant; | |
| Petrolatum | | | reported by Japan as a skin irritant; reported by Japan as an eye irritant; | |
| Silica | | | reported by Japan as a skin irritant; reported by Japan as an eye irritant; | |
| Sodium Dehydroacetate | | | reported by Japan as a skin irritant; reported by Japan as an eye irritant; | |
| Talc | | | reported by Japan as a skin irritant; reported by Japan as an eye irritant; | |
| Titanium Dioxide (CI 77891) | | | reported by Japan as a skin irritant; reported by Japan as an eye irritant; | |
| Yellow 5 Lake (CI 19140) | | | reported by Japan as a skin irritant; reported by Japan as an eye irritant; | |
| Zinc Oxide (CI 77947) | | | reported by Japan as a skin irritant; reported by Japan as an eye irritant; | |
| Laureth-4 | | | reported by Australia as causing Category 1 eye damage; reported by New Zealand as causing Category 1 eye damage; reported by New Zealand as an eye irritant; | |

108.    Some of Almay's other ingredients may also be sensitizers, depending on the chemical used.  Specifically, Almay does not disclose the identity of the fragrances it uses, listing only the generic *"aroma" or "flavor"* on its product label.  Many synthetic fragrances are known

28

to be human sensitizers, toxins and environmental hazards, and are associated with adverse reproductive effects, genetic mutations, and other ill effects.  Almay also adds **"*carbomer*"** to its products, but does not specify what substance it is adding.  "Carbomer" could refer to Carbomer 934, which is a sensitizer that irreversibly damages the skin after short exposure; in animal tests, the substance caused visible necrosis after less than 3 minutes of exposure. Corrosive reactions are typified by ulcers, bleeding, bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars. Some studies indicate that Carbomer 934 is a germ cell mutagen known or presumed to mutate human cells in a way that can be transmitted to children conceived after exposure. Some studies indicate that it is also a carcinogen.  Or "carbomer" could refer to carboxypolymethylene, Carbomer 940, or Carbomer 941, all of which lack sufficient safety testing.  All carbomers contain 0.1-0.5% benzene, a known human carcinogen that causes acute central nervous system damage and chronic bone marrow damage.

**F.      The Representations Are False, Deceptive, and Misleading**

109.    Almay's conduct deceived and/or was likely to deceive the public.  Consumers were deceived into believing that the Falsely Labeled Products were hypoallergenic, as labeled.

110.    All these representations were false, as explained above.

111.    Consumers would not know the true nature of the ingredients merely by reading the ingredient label.  Discovery of the true nature of the ingredients requires investigation beyond the grocery store and knowledge of chemistry beyond that of the average reasonable consumer.

**G.      Location of the Misrepresentations**

112.    Almay made the above false, deceptive, and misleading misrepresentations and omissions on the package of the Falsely Labeled Products.  *See* Exhibit 1.

29

113.    The misrepresentations and omissions were uniform and have actually been communicated to Plaintiff and to each member of the Class at every point of purchase and use.

## H.    Almay's Deceptive and Misleading Omissions

114.    Almay deceptively and misleadingly conceals other material facts about the Falsely Labeled Products, including:

a.    the true nature of the Falsely Labeled Products' ingredients;

b.    the identity of the Falsely Labeled Products' ingredients;

c.    that the Falsely Labeled Products contain sensitizers, irritants, toxins, carcinogens, pollutants, and/or otherwise hazardous substances;

d.    the concentration of the sensitizers, irritants, toxins, carcinogens, pollutants, and/or otherwise hazardous substances in the Falsely Labeled Products;

e.    that the Falsely Labeled Products are not "hypoallergenic";

f.    that the Falsely Labeled Products are not what a reasonable consumer would consider to be "hypoallergenic;"

g.    that the Falsely Labeled Products contain chemicals that a reasonable consumer would not expect in a product labeled as "hypoallergenic."

115.    Plaintiff and the members of the Class are not at fault for failing to discover Almay's wrongs earlier and had no actual or presumptive knowledge of facts sufficient to put them on inquiry notice.

116.    Almay has concealed the identity of several ingredients.  Discovery is therefore necessary to determine their identity.  These ingredients may also be sensitizers, irritants, or otherwise toxic.

117.    For example, Almay adds the words "*aroma*" or "*flavor"* to its products but does

not identify what chemical is used. Many ingredients used as flavors or fragrances are known skin sensitizers. Many are also extremely toxic to a person's skin, their overall health, and/or to the environment.

118.    Furthermore, Almay has not disclosed the concentration of each ingredient in its products. Further investigation and discovery is needed so that Plaintiff can ascertain whether entire products are also toxic.

119.    Almay has also concealed from consumers the nature of its products' ingredients despite consumers' requests. The toxic effects of its ingredients are still concealed from consumers today.

120.    These facts are not ascertainable and are still not known to Plaintiff, the Class members, and reasonable consumers. Almay's concealment tolls the applicable statute of limitations.

121.    To this day, Almay continues to conceal and suppress the existence, true identity, nature, and concentration of the sensitizers, irritants, toxins, carcinogens, pollutants, and/or otherwise hazardous substances in the Falsely Labeled Products.

122.    Similarly, to this day, Almay continues to conceal and suppress the fact that the Falsely Labeled Products are not "hypoallergenic" as promised.

123.    Almay fails to disclose, however, that many ingredients in its products are known skin allergens, even though they are not banned by Almay's list of "unacceptable ingredients." Exhibit 2.

## I.    <u>Almay Knew Its Representations Were False</u>

124.    Almay holds itself out to the public as trusted experts in the area of hypoallergenic, safe, mild, and gentle personal care products.

125.    Almay knew what representations it made regarding the Falsely Labeled Products, as all representations appear on the products' packages.

126.    Almay also knew what ingredients were added to each product, as (presumably) all product ingredients listed on the product packages and are further disseminated on their websites.

127.    Almay is governed by and thus is presumed to know laws governing the labeling of the Falsely Labeled Products, and thus is aware that its ingredients are sensitizers and irritants, that that its products require special disclosures and/or product label warnings.

128.    Almay thus knew all the facts demonstrating that its Falsely Labeled Products contain sensitizers and irritants, and that these products were therefore falsely labeled.

## J.    **Almay Intended Consumers To Rely**

129.    As Almay knows, consumers prefer hypoallergenic products. As Almay knows, consumers will pay a premium for hypoallergenic products or would not purchase these products at all unless they were hypoallergenic, as advertised.

130.    Almay advertises its products as meeting the unique needs of consumers who have or might develop skin sensitivities, and intends consumers rely on its "hypoallergenic" representations:

> The company's products have filled an important need for those individuals who have or may have developed a sensitivity to one or more of the substances used in cosmetic products and for those individuals who may become sensitized from repeated use of products that contain sensitizing substances.  Almay's products are specially prepared from carefully selected ingredients to minimize the presence of all known allergens.  Every product and shade is subjected to patch tests and no positive reaction are accepted.

Exhibit 2.

131.    Almay's misleading affirmative statements further obscured what Almay failed to disclose.  Thus, reliance upon Almay's misleading and deceptive representations and omissions

32

may be presumed.

132.    Almay made the false, deceptive, and misleading representations and omissions, intending Plaintiff and Class members to rely upon these representations and omissions in purchasing and using one or more Falsely Labeled Products.

133.    In making the false, misleading, and deceptive representations and omissions at issue, Almay knew and intended that consumers would purchase the Almay products when consumers would otherwise purchase a competing product or employ an alternate regimen (such as using an oil for moisturizing).

134.    In making the false, misleading, and deceptive representations and omissions at issue, Almay also knew and intended that consumers would pay a premium for hypoallergenic products, furthering Almay's private interest of increasing sales of its products and decreasing the sales of products marketed by its competitors.

**K.    Consumers Reasonably Relied**

135.    Consumers frequently rely on ingredient representations and information in making purchase decisions, especially in purchasing personal care products.

136.    When Plaintiff and the Class members purchased the Falsely Labeled Products, Plaintiff and the Class members saw the false, misleading, and deceptive representations detailed above, and did not receive disclosure of the facts concealed, as detailed above.

137.    These misrepresentations were uniform and were communicated to Plaintiff and every other member of the Class at every point of purchase and use.

138.    Plaintiff and the Class members were among the intended recipients of Almay's deceptive representations and omissions.

139.    Plaintiff and the Class members reasonably relied to their detriment on Almay's

33

misleading representations and omissions.

140. Almay's false, misleading, and deceptive misrepresentations and omissions deceived and misled, and are likely to continue to deceive and mislead, Plaintiff, the Class members, reasonable consumers, and the general public.

141. Almay's misleading affirmative statements further obscured what it failed to disclose. Thus, reliance upon Almay's misleading and deceptive representations and omissions may be presumed.

142. Almay made the deceptive representations and omissions with the intent to induce Plaintiff and the Class members to purchase the Falsely Labeled Products. Plaintiff's and the Class members' reliance upon such representations and omissions may be presumed.

143. Almay's deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions. Thus, Plaintiff's and the Class members' reliance upon such representations and omissions may be presumed as a matter of law. The materiality of those representations and omissions also establishes causation between Almay's conduct and the injuries sustained by Plaintiff and the Class members.

**L.    Almay's Wrongful Conduct Caused Plaintiff' Injury**

144. As an immediate, direct, and proximate result of Almay's false, misleading, and deceptive representations and omissions, Almay injured Plaintiff and the Class members in that they:

   a.    paid a sum of money for a product that was not as represented;

   b.    paid a premium price for a product that was not as represented;

   c.    were deprived the benefit of the bargain because the Falsely Labeled

Products they purchased were different from what Almay warranted;

d.    were deprived the benefit of the bargain because the Falsely Labeled Products they purchased had less value than what was represented;

e.    did not receive a product that measured up to their expectations as created by Almay;

f.    used a substance that Plaintiff and the members of the Class did not expect or consent to;

g.    used a product that was not hypoallergenic;

h.    without their knowing consent, used a substance that is generally harmful to their health;

i.    without their knowing consent, used a substance that is a skin sensitizer, irritant, or a known or suspected toxin, carcinogen, mutagen, teratogen, environmental pollutant, or otherwise is harmful to the environment and/or their health.

145.    Had Almay not made the false, misleading, and deceptive representations and omissions, Plaintiff and the Class members would not have been injured as listed above. Accordingly, Plaintiff and the Class members have suffered injury in fact as a result of Almay's wrongful conduct.

146.    Plaintiff and the Class members all paid money for the Falsely Labeled Products but did not obtain the full value of the advertised products due to Almay's misrepresentations and omissions. Plaintiff and the Class members purchased, purchased more of, or paid more for, the Falsely Labeled Products than they would have had they known the truth about the Falsely Labeled Products. Accordingly, Plaintiff and the Class members have suffered injury in fact and lost money or property as a result of Almay's wrongful conduct.

35

**M.**    **Almay Benefited From Its Misleading and Deceptive Representations and Omissions**

147.    As the intended, direct, and proximate result of Almay's false, misleading, and deceptive representations and omissions, Almay has been unjustly enriched through more sales of Falsely Labeled Products and higher profits at the expense of Plaintiff and the Class members.  As a direct and proximate result of its deception, Almay also unfairly obtained other benefits, including the higher value associated with a "hypoallergenic" brand and the resulting higher stock value, redirecting sales to it and away from its competitors, and increased sales of its other products.

## VI.    CLASS ALLEGATIONS

148.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and all other similarly situated United States residents who purchased the Falsely Labeled Products (the "Class").

149.    Excluded from the Class are the judges assigned to this case and the members of their immediate families, officers and directors of Almay; members of the immediate families of the officers and directors of Almay; Almay's legal representatives, heirs, successors, or assigns; and any entity in which they have or have had a controlling interest.

150.    Plaintiff seeks to certify the Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

151.    At this time, Plaintiff does not know the exact number of the Class members; given the nature of the claims and the number of sales that Almay has made of the Products, Plaintiff believes that members of each Class are so numerous that joinder of all members is impracticable.

152.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that

predominate over questions that may affect individual Class members include:

a.  whether Almay misrepresented and/or failed to disclose material facts concerning the Falsely Labeled Products;

b.  whether Almay's conduct was unfair and/or deceptive; and

c.  whether Almay breached an express warranty created through the labeling and marketing of its Falsely Labeled Products.

153.  Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, purchased one or more of Almay's Falsely Labeled Products at a premium price, relying on Almay's false and misleading representations, and Plaintiff sustained damages from Almay's wrongful conduct.

154.  Plaintiff will fairly and adequately protect the interests of the Class because Plaintiff is similarly situated with, and has suffered similar injuries as, the members of the Class she seeks to represent.  Plaintiff feels that she has been deceived, wishes to obtain redress of the wrong, and wants Almay to be stopped from perpetrating similar wrongs on others.  Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent, and she has retained counsel competent and experienced in conducting complex class action litigation, who were the first to publicly uncover the true scope and extent of Almay's wrongs.  Plaintiff has no interests adverse to those of the Class members and will vigorously prosecute this litigation.

155.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Specifically, no Class member has a substantial interest in individually controlling the prosecution of a separate action.  The damages suffered by each individual Class member likely will be relatively small, especially given the burden and expense

of individual prosecution of the complex litigation necessitated by Almay's conduct.  Thus, it would be virtually impossible for the Class members individually to redress effectively the wrongs done to them.

156.    The prerequisites to maintaining a class action for injunctive or equitable relief are met as Almay has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

157.    Upon information and belief, there are no pending lawsuits concerning the products at issue in this case.  Concentration of the litigation concerning this matter in this Court is desirable, and the difficulties likely to be encountered in the management of a class action are not great.  The resolution of the claims of all Class members in a single forum, and in a single proceeding, would be a fair and efficient means of resolving the issues raised in this litigation.

158.    The prosecution of separate actions by Class members would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Almay.

159.    Almay's conduct is generally applicable to the Class as a whole and Plaintiff seeks, *inter alia*, equitable remedies with respect to the Class as a whole.  As such, Almay's systematic policies and practices make declaratory relief with respect to the Class as a whole appropriate.

160.    The Class is specifically identifiable to facilitate provision of adequate notice and there will be no significant problems managing this case as a class action.  Notice to the Class can be made through various means, such as in-store leaflets, website notices, Facebook notices, notices on the labels of the packages, and/or direct notice to those consumers for which Almay knows the e-mail or physical mailing address.

## VII.    CAUSES OF ACTION

161.    The allegations in each Cause of Action are repeated and realleged in every other

Cause of Action as if set forth in full therein.

## COUNT 1

### Breach of Express Warranty

162.    Almay provided Plaintiff and other members of the Class with written express warranties including, but not limited to, warranties that its Falsely Labeled Products were "hypoallergenic."

163.    These affirmations of fact or promises by Almay relate to the goods and became part of the basis of the bargain.

164.    Plaintiff and members of the Class purchased the Falsely Labeled Products, believing them to conform to the express warranties.

165.    Almay breached these warranties.  This breach resulted in damages to Plaintiff and other members of the Class, who bought Falsely Labeled Products but did not receive the goods as warranted.

166.    On November 27, 2018, Plaintiff notified the seller of the Almay products she purchased (Walgreens) of the breach of warranty. Plaintiff also sent a copy of the notification to Almay.

167.    As a proximate result of the breach of warranties by Almay, Plaintiff and the other members of the Class did not receive goods as warranted.  Plaintiff and the members of the Class therefore have been injured and have suffered damages in an amount to be proven at trial.  Among other things, Plaintiff and members of the Class did not receive the benefit of the bargain and have suffered other injuries as detailed above.  Moreover, had Plaintiff and the Class members known the true facts, they would not have purchased the products, would have purchased fewer products, or would not have been willing to pay the premium price Almay charged for the products.

WHEREFORE, Plaintiff prays for relief as set forth below.

## COUNT 2

### Unjust Enrichment

168.    As a result of Almay's deceptive, fraudulent, and misleading labeling, advertising, marketing, and sales of the Falsely Labeled Products, Almay was enriched at the expense of Plaintiff and the other members of the Class through the payment of the purchase price for Almay's Falsely Labeled Products.

169.    Under the circumstances, it would be against equity and good conscience to permit Almay to retain the ill-gotten benefits that it received from Plaintiff and the other members of the Class, in light of the fact that the Falsely Labeled Products purchased by Plaintiff and the other members of the Class were not what Almay purported them to be.  Thus, it would be unjust or inequitable for Almay to retain the benefit without restitution to Plaintiff and the other members of the Class for the monies paid to Almay for such Falsely Labeled Products.

WHEREFORE, Plaintiff prays for relief as set forth below.

## COUNT 3

### Violation of New York's General Business Law § 349

170.    This cause of action is brought pursuant to New York General Business Law § 349 on Plaintiff's behalf and on behalf of the Class.

171.    Such acts of Almay, as described above, constitute unlawful, deceptive, and fraudulent business acts and practices.

172.    Almay has violated, and continues to violate, § 349 of the New York General Business Law, which makes deceptive acts and practices unlawful.  As a direct and proximate result of Almay's violation of § 349, Plaintiff and other members of the Class have suffered

40

damages in an amount to be determined at trial.

173. Pursuant to New York General Business Law § 349, Plaintiff seeks an order of this Court that includes, but is not limited to, an order enjoining Almay from continuing to engage in unlawful, unfair, or fraudulent business practices or any other act prohibited by law.

174. Plaintiff and the other members of the Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

175. The unfair and deceptive acts and practices of Almay, as described above, present a serious threat to Plaintiff and the other members of the Class.

WHEREFORE, Plaintiff prays for relief as set forth below.

## COUNT 4

### Violation of New York's General Business Law § 350

176. Almay's acts constitute unlawful, deceptive, and fraudulent business acts and practices.

177. Almay's misleading marketing, advertising, packaging, and labeling of the Falsely Labeled Products is false advertising likely to deceive a reasonable consumer. Indeed, Plaintiff and the other Class members were deceived regarding the characteristics of Almay's Falsely Labeled Products, as Almay's marketing, advertising, packaging, and labeling of the Falsely Labeled Products misrepresents and/or omits the true nature, quality, and/or ingredients of the Falsely Labeled Products.

178. There is no benefit to consumers or competition from deceptively marketing and labeling products. Indeed, the harm to consumers and competition is substantial.

179. Plaintiff and the other members of the Class who purchased the Falsely Labeled Products suffered a substantial injury as alleged herein. Plaintiff and the other members of the

Class who purchased the Falsely Labeled Products had no way of reasonably knowing that the Falsely Labeled Products they purchased were not as marketed, advertised, packaged, and labeled. Thus, they could not have reasonably avoided the injury each of them suffered.

180. Almay has violated, and continues to violate, § 350 of the New York General Business Law, which makes false advertising unlawful. As a direct and proximate result of Almay's violation of § 350, Plaintiff and other members of the Class have suffered damages in an amount to be determined at trial. Had Plaintiff and the Class members known the true facts, they would not have purchased the products, would have purchased fewer products, or would not have been willing to pay the premium price Almay charged for the products.

181. Pursuant to New York General Business Law § 350-e, Plaintiff seeks to recover actual damages or $500, whichever is greater, and seeks to have these damages trebled.

182. Pursuant to New York General Business Law § 350, Plaintiff also seeks an order of this Court that includes, but is not limited to, an order enjoining Almay from continuing to engage in false advertising or any other act prohibited by law.

183. Plaintiff and the other members of the Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

184. The unfair and deceptive acts and practices of Almay, as described above, present a serious threat to Plaintiff and the other members of the Class.

WHEREFORE, Plaintiff prays for relief as set forth below.

## VIII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment on behalf of herself and the proposed Class, providing such relief as follows:

A. Certification of the Class proposed herein under Federal Rule of Civil

Procedure 23(a), (b)(1), (b)(2), and (b)(3); appointment of Plaintiff as Class representative; and appointment of her undersigned counsel as counsel for the Class;

B.        A declaration that Almay is financially responsible for notifying members of the Class of the pendency of this suit;

C.        An order requiring an accounting for, and imposition of a constructive trust upon, all monies received by Almay as a result of the unfair, misleading, fraudulent, and unlawful conduct alleged herein;

D.        Restitution, disgorgement, refund, and/or other monetary damages, together with costs and disbursements, including reasonable attorneys' fees pursuant to the applicable statutes and prejudgment interest at the maximum rate allowable by law;

E.        Injunctive relief on behalf of the Class, enjoining Almay's unlawful and deceptive acts;

F.        Statutory damages in the maximum amount provided by law;

G.        Punitive damages in accordance with proof and in an amount consistent with applicable precedent; and

H.        Such further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff and the Class members hereby demand a trial by jury.

DATED: December 28, 2018

THE GOLAN FIRM
Yvette Golan
1712 N Street, NW, Suite 302
Washington, D.C. 20036
Tel: (866) 298-4150, ext. 101
Fax: (928) 441-8250

43

*s/ James A. Francis*
**FRANCIS & MAILMAN, P.C.**
James A. Francis (*pro hac vice*)
David A. Searles (*pro hac vice*)
1600 Market Street, Suite 2510
Philadelphia, PA 19103
Tel. (215) 735-8600
Fax. (215) 950-8000

*Attorneys for Plaintiff and the Class*